STATE OF CONNECTICUT *v.* DONALD STEVENSON
(10822)

HEALEY, SHEA, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued November 15, 1985—decision released February 11, 1986

*Steven W. Varney,* certified legal intern, with whom were *Todd D. Fernow* and, on the brief, *Michael R. Sheldon,* for the appellant (defendant).

*Richard D. Arconti,* special assistant state's attorney, with whom, on the brief, was *John A. Connelly,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant, Donald Stevenson, was found guilty of the crime of murder in violation of General Statutes § 53a-54a[1] after a trial to a jury. This appeal followed.

On appeal, the defendant claims that the trial court's instructions on intoxication require that he be given a new trial. In order to place his claims in context for our disposition of the appeal, it is necessary to set out the evidentiary backdrop.

---

[1] General Statutes § 53a-54a provides: "MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

On February 4, 1980, a grand jury returned an indictment accusing the defendant of the crime of murder in violation of General Statutes § 53a-54a.

Among the facts the jury could reasonably have found are the following: On November 10, 1979, at approximately 9:15 p.m., Waterbury police officers arrived at the East Farm Street Cafe on East Farm Street, Waterbury, to investigate an apparent shooting incident. Upon their arrival at the cafe, the officers found the victim, Willard "Cowboy" Oliver, bleeding from an apparent gunshot wound on the left side of his head. Ambulance personnel were ministering to him. At that time, the cafe was crowded, containing between twenty-five and forty persons. The police officers spoke to everyone there and recorded the names of all who were present.[2]

As a result of information obtained on the scene at the cafe, the police put out a general broadcast for the defendant. The defendant came to police headquarters at about 7:30 a.m. the next morning to turn himself in. He told the police that he had not meant to shoot anyone and that it was an accident. At that time, he was arrested on the charge of assault,[3] advised of his rights and questioned concerning the incident.[4]

Archie Davis, who was a friend of both the defendant and the victim, testified that he had been with the defendant[5] and other companions for some hours on November 10, 1979, prior to the shooting incident.

---

[2] There was testimony that the police took four people to the police station for the purpose of obtaining statements and that they took five or six written statements.

[3] The victim, Oliver, remained in a coma for some days before he died on November 17, 1979. At the trial, the medical examiner testified that "[t]he cause of death was the gunshot wound to the head and brain."

[4] On November 11, 1979, the defendant gave the police a statement, approximately two and one-half typewritten pages, concerning his recollection of the shooting incident as well as his whereabouts and activities earlier on the day of November 10, 1979. This statement was introduced into evidence at the trial as a full exhibit and was used, inter alia, on cross-examination of the defendant concerning his ability to recall specific matters.

[5] Archie Davis testified that he and the defendant had often fished and hunted together. When hunting, each used a shotgun, according to Davis.

Although Davis, the defendant and other companions had consumed some rum and beer prior to going together to the East Farm Street Cafe that night, Davis felt that when they entered the cafe, the defendant, insofar as his condition of sobriety was concerned, was "in stable condition at that time."[6] Davis, who had known the defendant for about twelve to fourteen years, observed nothing unstable or erratic about the way the defendant walked from his car to the cafe, recalled nothing unusual about his speech, and noted that his words were not slurred and that he did not have any trouble forming sentences.[7]

Sometime prior to the shooting incident, the victim had broken his leg and it was in a cast. The victim was sitting in a booth facing the door of the cafe and his crutch was "standing up," leaning against the booth. The defendant came over and kicked the crutch and it fell down. The victim picked it up and set it back against the booth. The defendant again kicked the crutch and the victim again picked it up. Words were exchanged between the victim and the defendant. The victim told the defendant to "cut this out or do you want to go on the outside?" The defendant then walked toward the back of the cafe and the victim sat down. Minutes later the defendant came back and stood by the booth. The victim again warned the defendant to desist.

The witnesses, Carrie Porter, Robert Carter and Thomas Newsome, were sitting in a booth with the vic-

---

[6] Archie Davis did not observe the shooting incident because, when he entered the East Farm Street Cafe, he went to the rear to go to the men's room. When he was in the men's room, he said that he heard a sound "like a thump" and when he came out, he saw a group of people gathered around one of the booths and he observed the victim on the floor. Davis did not see the defendant at all then or later that night.

[7] Archie Davis also testified that the defendant had no problem operating his motor vehicle as he drove it, with Davis as a passenger, over the route to the East Farm Street Cafe.

tim when the shooting incident occurred. Porter and Carter had known both the victim and the defendant prior to November 10, 1979, and while Newsome knew the victim, he did not know the defendant. Porter did not see anything unusual about the defendant, whom she had known for about twelve years, and he did not appear to her to have been drinking heavily. In addition, she did not see him stagger or trip and he did not appear to have any difficulty in walking or talking. Carter saw the defendant walk up to the booth; the defendant said something, and then Carter saw a flash when the defendant's arm was outstretched. The victim then fell into the booth. Carter did not see anyone push the defendant nor did he see him stumble. Newsome heard a "bang" at the time the defendant's hand was at the back of the victim's neck, and then the victim "fell over." Newsome did not see anyone bump into, push or shove the defendant, and he did not see him trip or stumble in any way.

Joseph Cerri, the only bartender on duty in the cafe that night, knew both the victim and the defendant and had seen them both there at the same time on many occasions. Cerri had not served the defendant that night and he also opined that the defendant "looked sober" to him and that "he looked all right." In addition, when he observed what seemed "like a small derringer" make "a noise," "a bang," the defendant's arm was "out at arm's length." Moreover, at that time, Cerri saw no one else in the defendant's immediate area. No one pushed, shoved or bumped into the defendant and Cerri did not see him trip or stumble. After this "noise," the victim fell to the floor and the defendant walked out of the cafe.

In contrast to that evidence, the jury had before it the defendant's conflicting testimony concerning his alcoholic intake on November 10, 1979. He said that he, Archie Davis and two other persons had been sit-

ting around and drinking for "about five, six hours" from about 3 p.m. One of the others had a quart of rum and they had some ale. In his statement to the police, he said that he and Davis drank "about *three pints* of Rum and we also drank some beer. I drank about six bottles of ale myself." (Emphasis added.) He testified that he had some rum and at least two cans of ale. The defendant testified that around 4:30 p.m. on November 10, 1979, he had had supper at a restaurant where he drank soda with his meal. He testified that he arrived at the East Farm Street Cafe around 8:45 p.m. or 9 p.m. that night and that he had no trouble driving his car there. His recollection of the "crutch" encounter with the victim and of what happened inside the East Farm Street Cafe thereafter, including the shooting, was vague and, in some instances during his testimony, nonexistent. He said that he did not recall what he said to the victim. He did recall that when he entered the cafe he was "pretty high" and "feeling pretty nice." He also said he was not "falling down drunk" or "staggering drunk" or slurring his words. He testified that he could not recall very much about the shooting itself although he did remember seeing the victim and saying something to him. The defendant did, however, "remember either tripping or falling or something. And as I started to get up, I heard what appeared to be a shot."[8] After

---

[8] Immediately after this, the defendant testified: "And, at this particular time, I was just, I was more in a daze. I was stunned because I hadn't too much pretty know what happened. I just looked around and I walked out of the bar, got into my car and just drove around for a little, for a few minutes. And, then I came back up on East Farm Street, because I was still trying to recollect as to what happened. I thought I heard a shot."

After learning from a bystander that someone had been shot, he started to drive. He was "still pretty much in a daze . . . [I] was pretty much shocked as to what had happened."

Getting himself together "after a couple of minutes," he drove on, got onto route I-84, originally intending to contact a police friend of his at the Southbury state police barracks. He testified, as did Detective Joseph Morgan, that he got off at the Southbury exit for the barracks, but that after

the shooting, he left the cafe and drove out of Waterbury on route I-84. Originally intending to seek out a state police officer in Southbury whom he knew, he decided not to do so. He did, however, take the Southbury exit off I-84 and threw his gun out of the car. The next day he accompanied Waterbury police officers to Southbury to look for his gun. They recovered his gun on the shoulder of the road about "fifteen feet, maybe" from where he told them to stop their car.

On appeal, the defendant claims that the trial court's instructions on the effect of his intoxication deprived him of a fair trial on the charge of murder by permitting the jury to convict him without first finding beyond a reasonable doubt that he had the intent to cause death in spite of his intoxication. He includes here the claim that the instructions require reversal because they gave rise to a reasonable possibility that the jury convicted him without first finding each essential element of the crime charged proven beyond a reasonable doubt. He also contends that intoxication at the time of the offense "may logically support an inference that [he] lacked an intent to kill even if it does not rise to the level of negating his capacity to form any rational intent." He also faults the instructions because, as he correctly points out, where a defendant charged with murder introduces evidence that he was intoxicated at the time of the crime, the state must prove beyond a reasonable doubt that in spite of his intoxication he intended to cause the death. He claims that reversible error was committed because the instructions complained of shifted to him the burden of establishing that at the time of the crime he was so intoxicated that he could not possibly have had the specific intent required for murder.

driving a short distance he threw his gun out of the window of his car and returned to Waterbury. His statement given to Morgan the morning of November 11, 1979, recounted in detail the streets he traversed in Waterbury prior to getting onto I-84 as well as relating his route back to Waterbury.

There emerges from the defendant's claims the argument that the instructions created an unlawful threshold for the jury's consideration of his intoxication so that, in following those instructions, the jury could convict him of murder without considering whether his intoxication negated the element of specific intent required for murder. Evidence of that intoxication, if considered and credited, would, he claimed, have reduced the crime to manslaughter. He argues that giving instructions "which permit the jury to ignore evidence" which, if credited, might raise a reasonable doubt as to the existence of the specific intent required for murder, "unconstitutionally relieves the state of its burden to negate every reasonable hypothesis consistent with innocence and inconsistent with guilt."

At the trial, the defendant neither filed a request to charge on the issue of intoxication nor did he except to the trial court's instructions on that matter.[9] Ordinarily, the defendant's failure to take an exception to the jury instructions would preclude review of such a claim upon appeal. Practice Book §§ 854, 3063; see also State v. Hinckley, 198 Conn. 77, 81, 502 A.2d 388 (1985).

" 'Only in most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court.' State v. Evans, 165 Conn. 61, 69, 327 A.2d 576 (1973). 'The policy behind this rule is both ancient and

---

[9] The defendant, however, filed requests to charge on other issues and also took several other exceptions to the instructions. We note that the state took the only exception to the instructions on intoxication. At that time, the state said in part: "[T]he opening comment of the Court was that it would appear that this [intoxication] played some part in the situation. And, I think that is a conclusion which only the jury can draw. I think perhaps the Court's language was a bit too strong. I don't think there was no [sic] request to charge on intoxication. I think the Court's charge was proper, but to say that it would appear and played some part in the situation is not necessarily a correct statement."

sound and "does not permit a defendant in a criminal case to fail, whether from a mistake of law, inattention or design, to object to matters occurring during a trial until it is too late for them to be corrected or even considered and then, if the outcome proves unsatisfactory, to raise them for the first time on an appeal." *State* v. *Taylor,* 153 Conn. 72, 86, 214 A.2d 362 [1965], cert. denied, 384 U.S. 921, 86 S. Ct. 1372, 16 L. Ed. 2d 442 [1966]; *State* v. *Evans,* supra, 66; *State* v. *Tuller,* 34 Conn. 280, 295 [1867].' *State* v. *Baker,* 182 Conn. 52, 56, 437 A.2d 843 (1980)." *State* v. *Hinckley,* supra, 81; see *State* v. *Reddick,* 197 Conn. 115, 125, 496 A.2d 466 (1985). In this case, we undertake a review for the limited purpose of determining whether there has been an infringement of a fundamental constitutional right. See *State* v. *Hinckley,* supra, 86–87; *State* v. *Evans,* supra, 70.

"Due process requires that the state establish beyond a reasonable doubt every essential fact necessary to establish the crime charged . . . including intent where intent is one of those elements." *State* v. *Kurvin,* 186 Conn. 555, 558, 442 A.2d 1327 (1982). While intoxication is neither a defense nor an affirmative defense to a murder charge in Connecticut, evidence of a defendant's intoxication is relevant to negate specific intent which is an essential element of the crime of murder. General Statutes § 53a-7;[10] *State* v. *D'Antuono,* 186 Conn. 414, 423, 441 A.2d 846 (1982); *State* v. *Crawford,*

[10] General Statutes § 53a-7 provides: "EFFECT OF INTOXICATION. Intoxication shall not be a defense to a criminal charge, but in any prosecution for an offense evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negate an element of the crime charged, provided when recklessness or criminal negligence is an element of the crime charged, if the actor, due to self-induced intoxication, is unaware of or disregards or fails to perceive a risk which he would have been aware of had he not been intoxicated, such unawareness, disregard or failure to perceive shall be immaterial. As used in this section, 'intoxication' means a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body."

172 Conn. 65, 70, 372 A.2d 154 (1976). The requisite that guilt be proved beyond a reasonable doubt means "proof which precludes every reasonable hypothesis except that which it tends to support, and is consistent with [a] defendant's guilt and inconsistent with any other rational conclusion. *State* v. *Smith,* 138 Conn. 196, 200, 82 A.2d 816 [1951]." *State* v. *Morrill,* 193 Conn. 602, 610–11, 478 A.2d 994 (1984); see *State* v. *Payne,* 186 Conn. 179, 184, 440 A.2d 280 (1982); *State* v. *Englehart,* 158 Conn. 117, 121–22, 256 A.2d 231 (1969); *State* v. *DeCoster,* 147 Conn. 502, 505, 162 A.2d 704 (1960); *State* v. *Foord,* 142 Conn. 285, 295, 113 A.2d 591 (1955). Throughout the trial, "the burden remained with the state to persuade the jury beyond a reasonable doubt that the defendant, in spite of any intoxication, had the capacity to, and did, form the [specific] intent to cause [Oliver's] death when he shot him." *State* v. *Crawford,* supra, 69–70. The instructions in this case never altered that burden.

We have set out above those circumstances relevant to the intoxication issue that are helpful in our analysis because a "court's charge is not to be examined in a vacuum. Rather, it is to be viewed in the context of the factual issues raised at the trial." *State* v. *Kurvin,* supra, 558; see *United States* v. *Park,* 421 U.S. 658, 674, 95 S. Ct. 1903, 44 L. Ed. 2d 489 (1975). Where a particular part of the charge is attacked, the test to be applied is whether the charge considered as a whole presents the case to the jury so that no injustice will result. *State* v. *Hines,* 187 Conn. 199, 206, 445 A.2d 314 (1982), and cases there cited. In the absence of a request to charge or an exception, to warrant reversal "the error must consist of a failure to submit to the jury the essential ingredients of the offense on which the conviction rests . . . or the case must involve plain error requiring such result in the interest of justice." *State* v. *Kurvin,* supra, 561.

A careful examination of that instruction discloses that the court at the outset stated that the jury was aware that the defendant was claiming, because of his alcoholic intake, that "he was incapable of forming a rational intent to commit the crime of murder or of controlling his conduct." The court then read and explained to the jury General Statutes § 53a-7, which includes the definition of "intoxication." The court's statement, contrary to the defendant's claim, that voluntary intoxication was significant only when it has proceeded so far as to have affected the operation of the mind of the accused and made him incapable for the time being of forming a rational intent or of controlling his will, was correct not only in the context of this charge on intoxication, but as a statement of law. It came after the court had read not only the statute but had also referred to the use in "everyday speech" of "intoxication or drunkenness," pointing to such commonly regarded indicia of intoxication in common parlance as slurred speech, gait, general appearance or evidence of having taken intoxicating liquor to excess. It immediately then gave them the legal definition of "intoxication" from § 53a-7. This statement did not misdirect the jury's focus because, as we have said, "[i]ntoxication is not a defense to murder, but is relevant to the capacity to form specific intent." *State* v. *D'Antuono,* supra, 423. Objection is also taken to the court's instruction that "only when a person is so under the influence of liquor that at the time the crime was committed, he was unable, rationally, to consider any matter or intelligently to harbor any intent or to control his activities that intoxication is a defense." Because this language is susceptible to misinterpretation and the reference to the alternative inability to "control his activities" is contrary to General Statutes § 53a-7,[11]

[11] In this context, we note that General Statutes § 53a-7 limits the relevance of intoxication evidence to negate an element of the crime charged and expressly makes such evidence immaterial on the element of recklessness or negligence.

trial courts are advised not to utilize this language in such an instruction. Nevertheless, there is no constitutional error because the remainder of the charge adequately negated any potential for misinterpretation. Immediately prior to this, the court, after noting that the law does not take into account the difference in individual susceptibility to alcohol, had told the jury: "An individual may show in his behavior the present effect of [the] liquor that he has taken and yet may still retain his faculties fully enough to reason, to know what he is about, and to form and carry out a rational intent."

There is one other sentence in the court's charge on intoxication that might be bothersome were it not for the balance of that instruction as well as the charge taken as a whole. The court said: "[T]he intoxication must be shown to have been of such a character as to create a state of mental confusion which would exclude the *possibility* of his having a specific intent." (Emphasis added.) We have eschewed, and continue to eschew, judging individual instructions in artificial isolation from the overall charge. *State* v. *Hines,* supra, 206; *State* v. *Roy,* 173 Conn. 35, 40, 376 A.2d 391 (1977); *State* v. *Crawford,* supra, 69. Nowhere in the remainder of the charge, if it is fairly read, is there any statement that the defendant's intoxication, in order to negate the specific intent, had to be of such a level as to exclude the possibility of having a specific intent. "Whether a charge is possibly misleading depends on the substance rather than the form of what is said." *State* v. *Kurvin,* supra, 565. This single statement was not misleading in the context of the charge on intoxication or in the context of the charge as a whole.

Plainly indicative of the court's direction that the jury consider *all* the evidence on intoxication, in addition to its charge on intoxication, is the following instruction: "If upon the *whole evidence* you entertain a reasonable doubt whether the condition of the accused was

such that he was able to still know what he was about and to form and carry out a rational intent, you must give to him the benefit of that doubt." (Emphasis added.) The "whole evidence" charge was given not once, but twice. The defendant's claim, therefore, that the jury's consideration of intoxication evidence was limited is without merit.

"Under the *Evans* standard, we are not concerned with merely technical or prejudicial errors, but only with errors that deprive the defendant of a fundamental constitutional right and a fair trial. The defendant must establish 'not merely that the instruction [was] undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional] right which [he] was guaranteed . . . .' *Cupp* v. *Naughten,* 414 U.S. 141, 146, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973)." *State* v. *Hinckley,* supra, 86–87. "Due process is not to be regarded as a giant constitutional vacuum cleaner which sucks up any claims of error which may occur to a party upon microscopic examination of the trial record." *State* v. *Kurvin,* supra, 564. From what we have said, it follows that the instructions on intoxication did not "implicate any fundamental constitutional right that would afford the defendant review under the exceptional circumstances doctrine of *State* v. *Evans." State* v. *Hinckley,* supra, 87.

There is no error.

In this opinion the other judges concurred.