# STATE OF CONNECTICUT *v.* RICHARD AUSTIN
## (SC 15369)

Callahan, C. J., and Berdon, Norcott, Palmer and McDonald, Js.

Argued December 5, 1997—officially released March 31, 1998

*Susan M. Hankins*, assistant public defender, with whom, on the brief, was *Temmy Ann Pieszak*, supervisory assistant public defender, for the appellant (defendant).

*Judith Rossi*, senior assistant state's attorney, with whom, on the brief, was *Michael Dearington*, state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The defendant, Richard Austin, was convicted by a jury of murder in violation of General Statutes § 53a-54a (a)[1] and carrying a pistol without a permit in violation of General Statutes § 29-35.[2] On

---

[1] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . ."

[2] General Statutes § 29-35 provides in relevant part: "Carrying of pistol or revolver without permit prohibited. Exceptions. (a) No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. . . ."

appeal[3] from the judgment of the trial court,[4] the defendant challenges the propriety of several of the trial court's jury instructions, as well as the admission of certain identification evidence. Specifically, the defendant claims that the court improperly instructed the jury concerning: (1) the element of intent; (2) consideration of his mitigating evidence of intoxication; (3) manslaughter in the first degree pursuant to General Statutes § 53a-55 (a) (3) by describing it as "reckless indifference manslaughter"; and (4) the definition of the term "extreme" as used in his affirmative defense of extreme emotional disturbance. The defendant further claims that the trial court improperly denied his motions to suppress identifications of him as the assailant. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant and the victim, Gloria Austin, were married in 1989. During the summer of 1991, the couple began having marital problems that resulted in domestic disturbances. The defendant was arrested twice in 1991, for incidents involving violence against his wife but the victim chose not to press charges. She did, however, obtain a restraining order on two separate occasions.

The defendant and the victim separated in October, 1992. The victim and the couple's three children remained in the family's apartment at 393 Sherman Avenue in New Haven, and the defendant moved into his

---

[3] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony . . . for which the maximum sentence which may be imposed exceeds twenty years . . . ." Section 51-199 (b) has since been amended by Public Acts 1997, No. 97-178, § 2.

[4] The trial court sentenced the defendant to sixty years imprisonment on his murder conviction and five years imprisonment on his conviction for carrying a pistol without a permit, to be served concurrently, for a total effective sentence of sixty years.

mother's house on Southwest Drive in New Haven. In the spring of 1992, the victim filed for a divorce, which became final on December 30, 1992. At that time, the victim was employed as a nurse's aid at a New Haven nursing home. On January 16, 1993, the victim, who was scheduled to work at 11 p.m., left her apartment to go to work at approximately 10:30 p.m.

That night, Marie Garrett, who lived next door to the victim, went to her window because she heard a woman shouting for help. Garrett saw a woman running down Sherman Avenue with a man chasing her. The woman tried to get into a car that was stopped at a traffic light but the car pulled away. The woman then ran across the street. Garrett subsequently heard a gunshot and saw the woman fall. Thereafter, the man stood over her body and fired several more shots. He then ran across the street into an alley between two houses. Garrett was unable to identify the man.

Rosco Sheffield and Priscilla Knox also observed the shooting. Sheffield saw a woman running down Sherman Avenue with a man chasing her with a gun in his hand. Sheffield heard the man shout at the woman: "[Y]ou're dead wrong!" Sheffield saw the woman try to get into a car that was stopped for a light but the car sped off when the man pointed a gun at the windshield. The woman then ran toward Sheffield, with the man still chasing her. Frightened, Sheffield ran up Goffe Street away from the shooter and, as he did, he heard three gunshots. Sheffield came back to Sherman Avenue after running around the block and saw the woman lying on the ground.

Priscilla Knox was standing on the corner of Goffe Street and Sherman Avenue waiting for a friend, when she saw a woman running down Sherman Avenue screaming: "Somebody help me! He's going to shoot me." Knox saw the woman, with a man following her,

run to a car that was stopped at a traffic light and the car pull away. Although the man was not directly facing her, Knox could see his face. When he was approximately five to six feet away from the woman, Knox heard gunshots and saw the woman fall to the ground, after which Knox heard additional gunshots. The victim was taken to the hospital where she died of a gunshot wound to the back of her head. Two .25 caliber shell casings were found at the scene of the shooting.

Thereafter, Sheffield and Knox each identified the defendant as the shooter. At trial, the defendant testified and admitted that he had shot the victim. He claimed, however, that he did not intend to kill her. According to the defendant, although he and the victim were separated and she had filed for divorce, he was unaware that the divorce had become final and he had hoped for a reconciliation.

At trial, the defendant raised the affirmative defense of extreme emotional disturbance pursuant to § 53a-54a (a) and introduced evidence of intoxication in accordance with General Statutes § 53a-7.[5] Because the defendant admitted that he had shot the victim, the central issue in the trial was his intent. The defendant's testimony concerning the immediate circumstances surrounding his shooting of the victim was as follows. On January 13, three days before the shooting, he found a card and love letter from the victim to another man.

[5] General Statutes § 53a-7 provides: "Effect of intoxication. Intoxication shall not be a defense to a criminal charge, but in any prosecution for an offense evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negate an element of the crime charged, provided when recklessness or criminal negligence is an element of the crime charged, if the actor, due to self-induced intoxication, is unaware of or disregards or fails to perceive a risk which he would have been aware of had he not been intoxicated, such unawareness, disregard or failure to perceive shall be immaterial. As used in this section, 'intoxication' means a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body."

Feeling "disappointed" and "distraught," the defendant decided to quit his job and move to Atlanta. On January 16, the defendant found another card and letter from the victim to the other man. When he telephoned the victim, she refused to speak to him. When he called again, a man answered the telephone and told the defendant not to call there anymore. The defendant testified that he then went to the victim's house but she was not at home. His daughter told him that the victim was seeing another man and had obtained a restraining order against the defendant. He returned to his mother's house where he proceeded to drink alcohol and use narcotics.

The defendant was familiar with the victim's work schedule and decided to confront her that night when she left for work. He carried a .25 caliber handgun in his pocket for protection, which, according to his testimony, was a common practice. He walked from his mother's house to the victim's house and waited in the driveway by the rear of her car for the victim to come out. As the victim was standing outside the apartment locking the front door, the defendant asked her why she was having another man in the house with the children present. According to the defendant, the victim replied: " 'He's not in our house. He is upstairs right now in your bed.' " The defendant said he "went ballistic" and yelled: "You're dead wrong!" He then pulled out his gun. The victim screamed and ran away from him. He testified that he chased her, intending to grab her and take her back to the house to confront the other man. He fired two shots at the victim, who fell to the ground. He denied firing any shots after she fell. The defendant then ran from the scene and hid the gun under a discarded tire.[6]

The jury found the defendant guilty of murder. Thereafter, the trial court denied the defendant's motions for

---

[6] The gun was not recovered.

a new trial and judgment of acquittal and rendered judgment in accordance with the jury verdict. This appeal followed. Additional facts will be set forth as they become relevant in the context of the defendant's specific claims.

I

We first address the defendant's challenge to the trial court's instruction on the element of intent. In its preliminary instructions, the trial court charged the jury that "a person acts intentionally with respect to a result or to conduct [described by a statute defining an offense] when his conscious objective is to cause such result or to engage in such conduct." The defendant contends that the portion of the definition relating to conduct improperly permitted the jury to find him guilty of murder if it found that he had the intent to engage in the conduct of firing his weapon. The state, on the other hand, argues that the trial court repeatedly gave a proper statement of the elements of each offense and that the jury was properly guided in its deliberations. The state argues that, in view of the entire charge and the instructional sheets that were distributed to the jury that properly listed the elements of each offense, the jury could not have been misled. We agree with the state.

The following additional facts are relevant to our resolution of this issue. During the trial court's preliminary instructions, the court read the statutory definition of intent contained in General Statutes § 53a-3 (11).[7] The court then instructed the jury on the elements of murder, stating that in order to find the defendant guilty of murder, the jury must find that he specifically

[7] General Statutes § 53a-3 (11) provides: "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ."

intended to cause the death of the victim.[8] The trial court also instructed the jury on intoxication, extreme emotional disturbance and the lesser included offense of manslaughter in the first degree pursuant to General Statutes § 53a-55.[9] At the conclusion of the court's charge, the defendant objected to the conduct portion of the instruction on intent.[10] The trial court did not reinstruct the jury. The trial court then provided the

---

[8] The trial court's instruction to the jury provides in relevant part: "First, I will instruct you regarding the crime of murder. A person is guilty of murder when with intent to cause the death of another person, he causes the death of such person. In this case, the state has the burden to prove beyond a reasonable doubt two elements in order to prove the defendant guilty of the crime of murder: (1) the defendant specifically intended to cause the death of the victim . . . and (2) acting with that intent, the defendant did shoot [the victim] and thereby caused her death.

"As to the first element, the state must prove beyond a reasonable doubt that the defendant specifically intended to cause the death of the victim. You will recall and apply my instruction regarding intent and intoxication in this regard.

"As to the second element, the state must prove beyond a reasonable doubt that the defendant, acting with the specific intent to cause the death of the victim, did, in fact, shoot the victim and thereby caused the death of the victim. This means, of course, that the state must prove that the death of the victim was caused by the actions of the defendant.

"As I have said, a person is guilty of murder when with specific intent to cause the death of another person, he causes the death of that person."

[9] General Statutes § 53a-55 provides: "Manslaughter in the first degree: Class B felony. (a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he committed the proscribed act or acts under the influence of extreme emotional disturbance, as provided in subsection (a) of section 53a-54a, except that the fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subsection; or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person.

"(b) Manslaughter in the first degree is a class B felony."

[10] The relevant portion of the defendant's objection to the trial court's instruction on intent was as follows:

jury with instructional handouts that listed the elements of the various crimes and did not contain a definition of intent.

During their deliberations, the jurors inquired of the court: "At what point in the event is intent determined? We are looking for clarification of 'intent.' Can it happen when the trigger is pulled?" The defendant reiterated his concern that the portion of the definition on intent relating to conduct may have confused the jury. The court reread its original charge and reinstructed the jury that: "[I]n order to prove the defendant guilty of murder, the state has the burden of proof beyond a reasonable doubt (1) that the defendant specifically intended to cause the death of the victim . . . and (2) acting with that intent, the defendant shot [the victim] and thereby caused her death. So the intent exists at the time of the shooting." The court reinstructed on the elements of intentional manslaughter in the first degree pursuant to § 53a-55 (a) (1). The jurors also requested that the testimony of the witnesses who saw the shooting be read back. The jurors later requested that the court reread the instructions on how intoxication can affect intent. The trial court then reiterated its instructions on intoxication and the statutory definition of intent.

We begin by reviewing the relevant legal principles that govern our consideration of the defendant's claim

"Mr. Ullmann [Defense Counsel]: I also take exception to the portion of Your Honor's definition of intent, which includes with respect to conduct as opposed to the result. And that can be interpreted by the jury to mean that the conduct in firing the weapon, itself, [is] enough to prove the next step, which is the intent to cause death. The statute reads that the definition of intent is with respect to a rule or to conduct. I don't think 'or to conduct' applies in this case . . . .

"The Court: Well, I specifically told them it was the specific intent to cause the death.

"Mr. Ullmann: I know Your Honor did, but you also gave this definition, which I think is over inclusive [in this] case . . . ."

of improper jury instructions. "It is well established that [a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Citations omitted; internal quotation marks omitted.) *State* v. *Dyson*, 217 Conn. 498, 501, 586 A.2d 610 (1991); see *State* v. *Faust*, 237 Conn. 454, 473–74, 678 A.2d 910 (1996).

We first note that " '[t]he specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim.' " *State* v. *Prioleau*, 235 Conn. 274, 322, 664 A.2d 743 (1995). "Due process requires that the state establish beyond a reasonable doubt every essential fact necessary to establish the crime charged . . . including intent where intent is one of those elements." (Internal quotation marks omitted.) *State* v. *Stevenson*, 198 Conn. 560, 568, 504 A.2d 1029 (1986). "[A]n improper instruction on an element of an offense . . . is of constitutional dimension." (Internal quotation marks omitted.) *State* v. *Prioleau*, supra, 284. The trial court, in defining intent, read the entire statutory definition of § 53a-3 (11), which contains references both to intent to cause a result and to intent to engage in proscribed conduct. Although we have stated that "[i]t is improper for the trial court to read an entire statute to a jury when the pleadings or the evidence support a violation of only a portion of the statute"; *State* v. *Chapman*, 229 Conn. 529, 537, 643 A.2d 1213 (1994); that is not dispositive.

We next must determine " 'whether it is reasonably possible that the jury was misled' " by the trial court's instructions. *State* v. *Prioleau*, supra, 284.

In *Prioleau*, where we faced a similar situation, the trial court read the entire statutory definition of intent in a murder trial where it was not warranted by the pleadings or evidence. Although we agreed with the defendant that the portion of the instruction regarding the intent to engage in proscribed conduct was irrelevant to a murder prosecution pursuant to § 53a-54a, we rejected his claim that the instruction warranted reversal of his conviction. Our review of the record revealed that the court referred to the intent to " 'engage in conduct' " only once and "repeatedly instructed the jury that in order to find the defendant guilty of murder, it first had to find that he had intended to cause the death of the victim." Id., 322.

The defendant argues that *Prioleau* is distinguishable because, in the present case, the trial court read the improper definition of intent both in its initial charge and in its supplemental charge in response to the jurors' requests for "clarification on 'intent' " and "how intoxication can impact intent . . . ." The defendant posits that the jurors' requests for clarification indicate that confusion existed regarding intent. Based on their questions and the trial court's response, the defendant contends that it was possible that the court's instructions on intent permitted the jury to find that the defendant's intent to engage in the conduct of firing the gun satisfied the intent to cause the death of the victim. We disagree.

Our careful review of the entire charge persuades us that, as in *Prioleau*, any possible risk of jury confusion over the element of intent was eliminated by the trial court's numerous proper instructions on the elements of murder. Specifically, the trial court expressly stated both in its initial charge and supplemental charge that

in order to find the defendant guilty of murder, the state must prove beyond a reasonable doubt that the defendant specifically intended to cause the death of the victim. See footnote 8 of this opinion. Moreover, in its instruction on intentional manslaughter, the court distinguished between the specific intent to cause death, required for a conviction of murder, and the specific intent to cause serious physical injury, necessary for a conviction of intentional manslaughter. The trial court also provided the jury with instructional handouts that properly listed the elements of the offenses.

In addition, the factual issues of this case mitigate against the possibility of jury confusion. "A court's charge is not to be examined in a vacuum. Rather, it is to be viewed in the context of the factual issues raised at the trial." *State* v. *Kurvin*, 186 Conn. 555, 558, 442 A.2d 1327 (1982). The defendant admitted that he pulled the trigger and shot the victim. Counsel for both parties agreed that the sole issue in dispute was the defendant's mental state. Under the circumstances, "[i]t strains reason to believe that the jury could have [understood] the challenged instruction as not requiring that the state prove beyond a reasonable doubt that the defendant intended to kill [the victim]." (Internal quotation marks omitted.) *State* v. *Prioleau*, supra, 235 Conn. 322.

## II

The defendant next argues that the trial court's instructions regarding intoxication misled the jury and deprived him of his constitutional right to due process.[11]

[11] The defendant invokes his due process rights under both the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. The defendant does not claim, however, that he is entitled to any greater protection under the due process clause of the state constitution than he is under the analogous provision of the federal constitution. For purposes of this appeal, therefore, we treat the state and federal due process clauses as embodying the same level of protection. See

Specifically, the defendant claims that: (1) the jury instructions set an improperly high standard for the jury's consideration of the evidence of intoxication and diluted the state's burden of proving intent beyond a reasonable doubt; and (2) the trial court improperly limited the jury's consideration of intoxication to specific intent offenses.

## A

The defendant contends that the court's instructions failed to advise the jury of the distinction between finding that he was capable of forming a specific intent, on the one hand, and finding that he actually formed the required intent, on the other.

At trial, the defendant testified that he was under the influence of alcohol and cocaine at the time of the shooting. The trial court instructed that: "If you find that the defendant was intoxicated at the time of the crime, you may take this fact into consideration in determining whether or not he was in such a state of intoxication as to be incapable of forming the required specific intent which is a necessary element for the commission of that particular crime. If you believe that the defendant, although intoxicated, was still capable of possessing the specific criminal intent, then his responsibility as to that particular crime is the same as if he were not intoxicated. You must first decide whether the defendant was intoxicated at the time of the alleged crime, and second, whether he was incapable of possessing the requisite specific criminal intent. . . . The state always has the burden of proving beyond a reasonable doubt that the defendant was capable of forming the required specific intent."

*State* v. *Joyce,* 243 Conn. 282, 288–89 n.6, 705 A.2d 181 (1997); *Northeast Savings, F.A.* v. *Hintlian,* 241 Conn. 269, 273 n.6, 696 A.2d 315 (1997).

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

As a preliminary matter, we note that "[w]hile intoxication is neither a defense nor an affirmative defense to a murder charge in Connecticut, evidence of a defendant's intoxication is relevant to negate specific intent which is an essential element of the crime of murder." *State* v. *Stevenson*, supra, 198 Conn. 568; see *State* v. *Traficonda*, 223 Conn. 273, 279, 612 A.2d 45 (1992) (" 'criminal defendant's intoxication is relevant to the determination of his capacity to form a specific intent to commit a crime' ").

The defendant argues that the trial court improperly instructed the jury that the evidence of intoxication negated specific intent only if the jury determined that he was incapable of possessing the requisite intent. The defendant contends that this instruction imposes too high a threshold for the consideration of intoxication because it fails to inform the jury of the distinction between whether the defendant had the capacity to form specific intent and whether he actually formed such an intent. We are unpersuaded.

"We have eschewed, and continue to eschew, judging individual instructions in artificial isolation from the overall charge." *State* v. *Stevenson*, supra, 198 Conn. 571. In the present case, the trial court properly informed the jury that it must decide: (1) whether the defendant was intoxicated at the time of the offense; and (2) if so, whether that intoxication rendered him incapable of forming the intent required for the commission of the charged offenses. See *State* v. *Rivera*, 223 Conn. 41, 50, 612 A.2d 749 (1992). Our review of the jury instructions as a whole discloses that the court adequately informed the jury that the state had the burden of proving that the defendant actually possessed the requisite intent. We are unpersuaded that the challenged instructions, when considered in the context of the entire charge, either created an unlawful threshold

for the jury's consideration of intoxication or diluted the state's burden of proof of specific intent.

B

The defendant next claims that the trial court's failure to instruct the jury that his intoxication could be considered as affirmative proof that his mental state had been one of recklessness violated his due process rights. Specifically, the defendant claims that the trial court improperly instructed the jury to apply its instructions on intent and intoxication only to the specific intent crimes of murder and intentional manslaughter.[12] The state argues that this claim is unpreserved and should not be reviewed. We agree with the state.

The defendant concedes that this claim was not preserved at trial but maintains that he is entitled to review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[13] and the plain error doctrine pursuant to Practice Book § 4061,[14] now Practice Book (1998 Rev.) § 60-5.

In *State* v. *Ortiz*, 217 Conn. 648, 659, 588 A.2d 127 (1991), we rejected a virtually identical request for

[12] The trial court instructed the jury as follows: "You will not apply my instruction regarding intent and intoxication to this crime of reckless indifference manslaughter in the first degree."

[13] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[14] Practice Book § 4061, now Practice Book (1998 Rev.) § 60-5, provides in relevant part that this court "shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

review. In *Ortiz*, the defendant in a murder trial claimed that the trial court had improperly failed to instruct the jury that they could consider his intoxication as proof "that his mental state had been the less culpable one of recklessness"; id., 658; and sought review under *Golding*. Id., 658–59. We concluded that review of the defendant's unpreserved jury instruction claim under *Golding* was unavailing "[b]ecause a lesser included offense instruction is purely a matter of common law, and therefore does not implicate constitutional rights . . . ." (Citations omitted.) Id., 659. We further concluded that the defendant's claim was not reviewable as plain error because such review "is reserved for those truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) Id., 659–60. Accordingly, in the present case, we decline to afford the defendant's claim further consideration.

III

The defendant next claims that the trial court confused the jury by improperly referring to manslaughter in the first degree under § 53a-55 (a) (3)[15] as "reckless indifference manslaughter." The defendant reasons that this reference "minimized the gravity of the [defendant's] conduct" such that it was reasonably possible that the jury would conclude that "the defendant should not be found guilty under this subsection, because his culpability was far greater" than reckless indifference. This claim is also without merit.

[15] General Statutes § 53a-55 provides in relevant part: "(a) A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person. . . ."

Our examination of the entire charge reveals that, while the trial court did use the phrase "reckless indifference manslaughter," there was no reasonable possibility that the jury could have been misled regarding the requirement of extreme indifference. The defendant concedes that the trial court repeatedly instructed the jury properly regarding the elements necessary to convict him of manslaughter pursuant to § 53a-55 (a) (3),[16] and provided a proper definition in its instructional handout. Furthermore, the trial court on two separate occasions stated that the term it used to describe the crime had no significance and instructed the jury that it should focus instead on the elements of the crime.[17] "The jury is presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Raguseo*, 225 Conn. 114, 131, 622 A.2d 519 (1993). Finally, as the state aptly notes, it is not reasonably possible that the jury was misled because it convicted the defendant on the charge of murder and, therefore, did not even reach the elements of the lesser included offenses.

---

[16] The trial court instructed the jury in relevant part as follows: "A person is guilty of reckless indifference manslaughter in the first degree when under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person. There is no element of intent involved in this crime. You will not apply my instruction regarding intent and intoxication to this crime.

"In order to prove a person guilty of the crime of reckless indifference manslaughter in the first degree, the state must prove three elements. First, that the defendant recklessly engaged in conduct which created a grave risk of death to [the victim]; second, he did so under circumstances which evinced or demonstrated an extreme indifference to human life; and third, that he thereby caused the death of [the victim]."

[17] The trial court's specific statements were as follows: "Now, the words I use to label each one of these [crimes] is not significant. What is significant, as I will explain later, are the essential elements of each of these crimes.

* * *

"Reckless indifference, as I told you, my designation of these various labels on these various manslaughter categories, the labels are not important, it is the elements that are important."

## IV

In the defendant's final challenge to the jury instructions, he argues that, in instructing on his affirmative defense of extreme emotional disturbance, the trial court improperly defined the term "extreme" as "the greatest degree of intensity away from the normal state of the defendant."[18] The defendant contends that this definition reasonably could have misled the jury to find that a person who had been violent in the past is not entitled to use the defense because "a violent incident is not 'the furthest' away from the norm for the defendant." The state argues that this claim is unpreserved and should not be reviewed. Again, we agree with the state.

The following additional facts are relevant to the defendant's claim. The defendant submitted a request to charge on the defense of extreme emotional disturbance that defined extreme as "ha[ving] its ordinary meaning . . . [of] great or substantial." The defendant further requested "that the Court *not* charge that 'extreme' means the 'greatest degree of intensity away from the norm, away from the normal or usual state, for the defendant.' " (Emphasis in original.) At the conclusion of the jury instructions, the defendant objected to the trial court not having used his proffered definition of extreme.[19]

---

[18] The definition of extreme used by the trial court is precisely the one we adopted in *State* v. *Elliott*, 177 Conn. 1, 10, 411 A.2d 3 (1979). In *Elliott*, we reviewed the defendant's challenge to instructions on the extreme emotional disturbance defense and stated that "[i]n its charge, the trial court should explain that the term 'extreme' refers to the greatest degree of intensity away from the norm for that individual." Id.

[19] The colloquy between the defense counsel and the trial court provided in relevant part:

"Mr. Ullmann: And finally, that the definition of the word 'extreme,' which is the greatest degree of intensity is—

"The Court: You had—

"Mr. Ullmann: Different from the one that I had.

"The Court: Yes. Yes. Court's charge will remain the same."

We note that "[e]xtreme emotional disturbance operates as a partial affirmative defense to murder. One who kills while under the influence of an extreme emotional disturbance cannot be convicted of murder but can be found guilty of manslaughter." *State* v. *Fair*, 197 Conn. 106, 108, 496 A.2d 461 (1985), cert. denied, 475 U.S. 1096, 106 S. Ct. 1494, 89 L. Ed. 2d 895 (1986).

The defendant, in both his brief and at oral argument before this court, argues that the definition the trial court used was too restrictive. He advocates that we adopt a new definition of extreme as " 'excessive, or far advanced, or grievous.' " This was not, however, the definition that was proffered by defense counsel to the trial court. We decline to review this issue because the specific language that the defendant requests this court to adopt was not raised at trial. Thus, the trial court never had an opportunity to rule on the language that the defendant now advocates. Moreover, we note that the defendant's claim does not warrant review under *Golding* because we previously have determined that improper jury instructions concerning the defense of extreme emotional disturbance are not of constitutional dimension. *State* v. *Foreshaw*, 214 Conn. 540, 546, 572 A.2d 1006 (1990); *State* v. *Suggs*, 209 Conn. 733, 751, 553 A.2d 1110 (1989). The defendant's claim, moreover, does not warrant review under the plain error doctrine because the trial court properly instructed the jury. See footnote 18 of this opinion. Accordingly, no manifest injustice resulted to the defendant.

V

The defendant claims that the trial court improperly denied his motions to suppress the identifications of him as the shooter by Sheffield and Knox in violation of his due process rights. He argues that both identifications resulted from unnecessarily suggestive procedures and were unreliable. We disagree.[20]

---

[20] Because we conclude that the identification procedures were not unnecessarily suggestive and, in any event, were reliable under the totality of the

The following additional facts are relevant to our resolution of this issue. Prior to trial, the trial court held a hearing on the defendant's motions to suppress both identifications. At the hearing, Sheffield testified that he had informed the police that he was at the scene of the shooting and that he had seen the shooter. He was directed by the police to go to the police station and was told to wait outside the station to see if he could identify the shooter.

At that time, the defendant, who had been taken to the police station for an interview and had declined to make a statement without his counsel present, was leaving the station in the company of two officers, who were supposed to drive him home. Sheffield identified the defendant as the shooter as the defendant was leaving the police station. Sheffield stated that he "immediately recognized" the defendant and, during the suppression hearing, Sheffield made an in-court identification of the defendant as the shooter.

Knox told a friend that she had seen the shooting and the friend subsequently contacted the police. On January 25, 1993, Knox gave a tape-recorded statement to the police in which she described the shooter as a "brown skinned" male who wore a pair of jeans, a blue, gray and red coat, and sneakers. In her statement, Knox stated that she was "pretty sure" that she would be able to identify the shooter if she were to see him again. The next day, the police showed Knox a photographic array containing photographs of eight persons from which she identified the defendant as the shooter, stating that she was certain that the defendant was the man that she had seen shoot the victim. She was then shown an individual photograph of the defendant, and she

circumstances, we need not address the state's argument that the defendant's testimony that he shot the victim is dispositive of the reliability of the identifications.

again identified him as the shooter. At the suppression hearing, Knox made an in-court identification of the defendant as the shooter.

After hearing testimony, the trial court denied the defendant's motions to suppress. The trial court stated that, with regard to the identification made by Sheffield, "[e]ven though a one-on-one showing may in certain circumstances tend to be suggestive, the court finds that under the circumstances of this case, there was no suggestiveness," and "[t]here was no suggestion by any police officer who to identify . . . ." The trial court concluded that Knox's identification of the defendant should not be suppressed because "[t]he photo[graphic] array was not suggestive in any manner, and she made the identification, positively, of the defendant as the shooter." Finally, the trial court determined that the identifications by both Sheffield and Knox were reliable.

In determining whether identification procedures violate a defendant's due process rights, "[t]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . To prevail in his claim, the defendant must demonstrate that the trial court erred in both of its determinations regarding suggestiveness and reliability of identifications in the totality of the circumstances. . . . An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . If the procedures used to identify the defendant were not unnecessarily suggestive, we need not independently analyze whether the identification was reliable." (Citations omitted; internal quotation marks

omitted.) *State* v. *Taylor*, 239 Conn. 481, 498–99, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997). "The defendant bears the burden of proving both that the identification procedures were unnecessarily suggestive and that the resulting identification was unreliable." *State* v. *White*, 229 Conn. 125, 162, 640 A.2d 572 (1994). "Generally, '[t]he exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is manifestly suspect.' " *State* v. *Wooten*, 227 Conn. 677, 685–86, 631 A.2d 271 (1993); see *State* v. *Figueroa*, 235 Conn. 145, 159, 665 A.2d 63 (1995).

We turn first to the question of whether the procedures used in Sheffield's identification were unnecessarily suggestive. The defendant contends that the combination of the one-on-one confrontation, the police's request to help them identify the shooter, the police station setting of the identification, and the presence of two police officers flanking the defendant as he exited the station rendered Sheffield's identification of the defendant as the shooter unconstitutionally suggestive.

"We have recognized that generally a one-to-one confrontation between a [witness] and the suspect presented to him for identification is inherently and significantly suggestive because it conveys the message to the [witness] that the police believe the suspect is guilty." (Internal quotation marks omitted.) *State* v. *Tatum*, 219 Conn. 721, 727, 595 A.2d 322 (1991). We have concluded, however, that under certain circumstances such a procedure does not constitute impermissible suggestiveness. See *State* v. *Wooten*, supra, 227 Conn. 686–87; *State* v. *Collette*, 199 Conn. 308, 310–11, 507 A.2d 99 (1986); *State* v. *Amarillo*, 198 Conn. 285, 292, 503 A.2d 146 (1986); *State* v. *Hamele*, 188 Conn. 372, 377–78, 449 A.2d 1020 (1982).

In *State* v. *Wooten*, supra, 227 Conn. 686, the defendant was seated in the back of a police car when the victim identified him as her assailant. We stated that the confrontation "although suggestive, was nonetheless not unnecessarily so because the exigencies of the situation justified the procedure . . . ." (Internal quotation marks omitted.) Id. The identification procedure provided "the victim with the opportunity to identify her assailant while her memory of the incident was still fresh"; id.; and permitted the police to quickly eliminate the person as a suspect and to " 'continue the investigation with a minimum of delay . . . . ' " Id.

As in *Wooten*, we are persuaded that the identification procedure in the present case, although suggestive, was not unnecessarily so. "As we have remarked, [a]n immediate viewing of the suspect may be justified where it [is] important for the police to separate the prime suspect gold from the suspicious glitter, so as to enable them . . . to continue their investigation with a minimum of delay." (Internal quotation marks omitted.) Id., 686–87. In the present case, the defendant was not under arrest, he had refused to make any statement, and it was necessary for the police to make a prompt identification in order to detain him. Furthermore, the trial court noted that there was no evidence that the police at any time suggested to Sheffield that the defendant was the shooter.

Even if we were to assume that the identification procedure was unnecessarily suggestive, Sheffield's identification was reliable under the totality of the circumstances. "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . . To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, we must weigh the corrupting effect of the suggestive procedure in light of certain factors such as the opportunity of the witness to view the criminal at the time of the

crime, the witness' degree of attention, the accuracy of [that person's] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." (Citation omitted; internal quotation marks omitted.) Id., 687–88.

At the suppression hearing, Sheffield testified that he was standing approximately thirty feet from where the shooting had occurred. His attention was focused on the scene of the man, with a gun in his hand, chasing the woman. The area was well lit and he had an unobstructed view of the man's face. The identification was made within hours of witnessing the incident. Sheffield stated that he recognized the defendant immediately and he displayed no uncertainty in identifying the defendant. We agree with the trial court that Sheffield's identification was reliable and, accordingly, we conclude that the trial court properly denied the defendant's motion to suppress Sheffield's identification.

We next consider whether Knox's identification should have been suppressed because, as the defendant alleges, the photographic array was unnecessarily suggestive. In her interview with Detective James Ponteau, Knox described the man as "brown skinned." The defendant claims that the photographic array contained eight photographs, "only one of which has an apparently 'light' skin tone, one has a medium tone, and six others have very dark skin tones." The defendant contends that the "unique light skin characteristic of the defendant's photograph in relation to others in the array rendered the identification procedure unnecessarily suggestive."

"The presentation of an array of several photographs to witnesses, including that of the suspect, does not constitute an impermissibly suggestive pretrial identification procedure in the absence of any unfairness or

other impropriety in the conduct of the exhibit." (Internal quotation marks omitted.) *State* v. *White*, supra, 229 Conn. 162.

After reviewing the challenged array, we conclude that it was not impermissibly suggestive. The photographic array shown to Knox was a black and white photocopy of eight photographs rather than an array of color photographs, thus rendering any distinction based on skin tone extremely subtle.[21] The defendant was depicted with seven other black males who all appeared to be approximately the same age. All of the individuals had short hair and mustaches. Although the defendant's skin tone arguably appears somewhat lighter than the other individuals, " '[a]ny array composed of different individuals must necessarily contain certain differences.' " *State* v. *Boscarino*, 204 Conn. 714, 726, 529 A.2d 1260 (1987); see *State* v. *Taylor*, supra, 239 Conn. 499–500 ("[w]e note that there exists no constitutional mandate that gives the defendant the right to a photographic array of look-alikes"). The defendant's photograph was not so distinctive in skin tone from the other individuals in the photographs as to " 'suggest to [Knox] that [the defendant] was more likely to be the culprit.' " *Jarrett* v. *Headley*, 802 F.2d 34, 41 (2d Cir. 1986). Moreover, there was no evidence that the array was presented in a suggestive manner. Because we conclude that the array shown to Knox was not unnecessarily suggestive, we need not reach the defendant's second claim that her identification was not reliable. *State* v. *White*, supra, 229 Conn. 164; *State* v. *Tatum*, supra, 219 Conn. 727.

The judgment is affirmed.

In this opinion the other justices concurred.

[21] We also note that Knox's very general description of the shooter's complexion as "brown skinned" necessarily embraced a wide degree of graduations in skin tone.