STATE OF CONNECTICUT *v.* ROBERT DEJESUS
(SC 16326)

Sullivan, C. J., and Borden, Katz, Palmer and Zarella, Js.

Argued November 28, 2001—officially released June 11, 2002

*Louis S. Avitabile*, special public defender, for the appellant (defendant).

*Christopher T. Godialis*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Robin Lipsky*, assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Robert DeJesus, appeals from the judgment of conviction, following a jury trial, of murder in violation of General Statutes § 53a-54a[1] and conspiracy to commit murder in violation of General Statutes §§ 53a-54a and 53a-48.[2] On appeal, the defendant raises multiple challenges to the validity of his convictions. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant, Thunder Mongkosilapa and Dennis Alers, who were close friends, sold illegal drugs at 289 Grove Street in Waterbury. The defendant first met the victim, Abraham Garcia, a member of the Latin Kings gang, when Garcia came to the Grove Street address threatening Mongkosilapa in connection with a long-standing dispute. The defendant testified that this dispute eventually led him to believe that the victim had a "green light," or an order to kill him, Mongkosilapa and Alers.

---

[1] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes § 53a-48 provides in relevant part: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. . . ."

Around 12 a.m. on July 28, 1996, the defendant, Mongkosilapa and Alers borrowed a car and drove around the south end of Waterbury. Mongkosilapa drove the car, the defendant sat in the front passenger seat and Alers sat in the backseat behind the defendant. The defendant was armed with a gun that he had purchased on the street more than one month earlier. They drove past the victim, who was standing on the side of East Liberty Street in Waterbury with five other people, and then circled the block. Upon their return, they saw the victim standing alone. Mongkosilapa stopped the car in front of the victim. The defendant then fired one shot after which Alers fired five shots at the victim. A woman who resided nearby found the victim lying motionless on her doorstep.

In the early morning hours of July 28, 1996, Mongkosilapa, Alers and the defendant went to the apartment of Delma Rodriguez, who was Alers' girlfriend. Alers told Rodriguez that he just had killed someone and instructed her to pack her bags to leave. She packed quickly and got into the car with the defendant, Mongkosilapa and Alers. They traveled on back roads to the apartment of Mongkosilapa's sister in Bridgeport.

During the trip, Rodriguez overheard Alers say to either Mongkosilapa or the defendant that "it was crazy, I wet that nigger. I don't know if I bodied him son."[3] Rodriguez also overheard the defendant say that his gun had jammed when he attempted to shoot.

The three men then dropped off Rodriguez at the sister's apartment in Bridgeport and went back to Waterbury to return the car. They returned to Bridgeport in another car with two of Rodriguez' female friends. The defendant, Alers, Rodriguez and her two friends then left Bridgeport and headed for New York

---

[3] The word "wet" is slang for shot, the word "bodied" is slang for killed and the word "son" is slang for close friend.

while Mongkosilapa stayed in Bridgeport. During the trip, Rodriguez overheard Alers say that the defendant, Mongkosilapa and Alers were "in a car, it was [Mongkosilapa] driving, [Alers] was on the passenger's side of [Mongkosilapa] and [the defendant] was in the backseat, and that [the defendant] shot the first shot, but his gun . . . jammed, and he couldn't proceed shooting, and [Alers] did all the other—he shot all the other bullets."

On August 3, 1996, Alers was shot and killed in New York by a New York City police officer who, together with Waterbury police officers, was attempting to arrest Alers in connection with the victim's murder. The defendant gave the police a written statement that same day in which he admitted that he had been the first one to fire a shot. The defendant maintained that he had pointed his gun out of the car window and fired, but that the gun had jammed. The defendant then claimed that he had heard several gunshots and had seen the victim run away screaming before falling to the ground.

At trial, the defendant claimed that he had fired his gun in self-defense. He testified that he had thought that the victim "looked like he was about to pull out a gun," which caused the defendant to fire a "warning shot." The defendant further testified that he was unaware that Alers would subsequently shoot at the victim.[4]

During cross-examination, the defendant testified that he had neglected to tell the police in his statement that the victim looked like he was going to pull out a gun because "[i]t was never asked." Furthermore, the

[4] We note that Mongkosilapa invoked his fifth amendment privilege against self-incrimination and, therefore, was excused from testifying at the defendant's trial. Additionally, because Alers was shot and killed as police attempted to arrest him for the victim's murder, he also was unavailable to offer testimony in the defendant's case.

defendant testified that he never had complained to or sought protection from the police regarding the victim's threats because the police were not trustworthy. The defendant did not testify or otherwise state to the police that he actually had seen the victim with any sort of weapon at the time of the shooting. It was undisputed that no weapon was found on or near the victim's body.

Arkady Katsnelson, the state medical examiner, performed an autopsy on the victim's body. Katsnelson determined that the victim had sustained five gunshot entry wounds. Katsnelson testified that, of the five bullets that penetrated the victim's body, only one entered through the front of the body. According to Katsnelson, the other four bullets entered through the back of the victim's torso and legs. Katsnelson testified that it was his opinion that the "cause of death [was] a gunshot wound to the chest with injuries to the [victim's] lung and heart."

The jury found the defendant guilty of murder and conspiracy to commit murder. The defendant filed a motion for a new trial, which the trial court denied. Thereafter, the court rendered judgment in accordance with the jury's verdict and sentenced the defendant to a total effective term of forty-eight years imprisonment. The defendant appealed from the judgment of conviction to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Additional facts will be set forth as necessary.

I

We first address the defendant's challenge to the trial court's instructions[5] on the element of intent. Specifically, the defendant contends that the trial court's read-

---

[5] Because the jury requested to rehear the trial court's entire instruction on the murder charge, the portion of the instruction at issue actually was presented to the jury twice.

ing of the entire definition of intent, as set forth in General Statutes § 53a-3 (11),[6] improperly permitted the jury to find him guilty of murder if it found that he had the intent to engage in the conduct of shooting a gun without necessarily finding that he specifically had intended to cause the victim's death. The state, on the other hand, argues that the trial court properly instructed the jury on the element of intent, and, therefore, the jury properly was guided in its deliberations. We agree with the state.

The defendant did not object to the court's instructions on the element of intent at trial and now seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Under *Golding*, a defendant can prevail on an unpreserved claim of constitutional error only if the following conditions are satisfied: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id., 239–40. "In the absence of any one of these conditions, the defendant's claim will fail." Id., 240.

The defendant's claim satisfies the first two prongs of *Golding* because the record is adequate for review and "[a]n improper instruction on an element of an

[6] The trial court's instruction contained the entire definition of intent as set forth in § 53a-3 (11). The trial court instructed the jury in relevant part: "Intent relates to the condition of mind of the person who commits the act, his purpose in doing it. As de[fined] by our statute and law, a person acts intentionally with respect to a result or to conduct when his conscious objective is to cause such result or to engage in such conduct." The trial court's supplemental instruction on the element of intent; see footnote 5 of this opinion; was identical to the foregoing instruction in all material respects.

offense . . . is of constitutional dimension." (Internal quotation marks omitted.) *State* v. *Austin*, 244 Conn. 226, 235, 710 A.2d 732 (1998). "Due process requires that the state establish beyond a reasonable doubt every essential fact necessary to establish the crime charged . . . including intent where intent is one of those elements." (Internal quotation marks omitted.) Id. The defendant's claim fails, however, under the third prong of *Golding* because there was no violation of his constitutional right to due process and the trial court's instruction did not deprive him of a fair trial.

We begin by reviewing the pertinent legal principles that govern our consideration of the defendant's claim. "When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Denby*, 235 Conn. 477, 484–85, 668 A.2d 682 (1995).

"[A]n accused has a fundamental right, protected by the due process clauses of the federal and Connecticut constitutions, to be acquitted unless proven guilty of each element of the charged offense beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Hinton*, 227 Conn. 301, 308, 630 A.2d 593 (1993). "It is . . . constitutionally axiomatic that the jury be instructed on the essential elements of a crime charged. . . . [T]he failure to instruct a jury on an element of a

crime deprives a defendant of the right to have the jury told what crimes he is actually being tried for and what the essential elements of those crimes are." (Citations omitted; internal quotation marks omitted.) *State* v. *Denby*, supra, 235 Conn. 483–84.

"The specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim." (Internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 322, 664 A.2d 743 (1995).

The defendant claims that the trial court's inclusion of the entire definition of intent, as set forth in § 53a-3 (11), in its instructions on the element of intent allowed the jury to find him guilty of murder even if it did not find that the defendant had the conscious objective to cause the death of the victim. The defendant contends that the instructions at issue allowed the jury to convict him of murder as long as it found that the defendant had the conscious objective to engage in the conduct that resulted in the victim's death. "Although we have stated that [i]t is improper for the trial court to read an entire statute to a jury when the pleadings or the evidence support a violation of only a portion of the statute; *State* v. *Chapman*, 229 Conn. 529, 537, 643 A.2d 1213 (1994); that is not dispositive. We must determine whether it is reasonably possible that the jury was misled by the trial court's instructions." (Internal quotation marks omitted.) *State* v. *Austin*, supra, 244 Conn. 235–36.

In *State* v. *Prioleau*, supra, 235 Conn. 321–22, this court was presented with a claim identical in all material respects to the defendant's claim in the present case. In *Prioleau*, we rejected the claim advanced by the defendant, Herbert Prioleau, that the trial court's allegedly improper inclusion of the entire definition of intent

contained in § 53a-3 (11) in its instructions to the jury warranted reversal of his murder conviction. Id., 321. We concluded that, upon review of the trial court's entire charge, including repeated instructions that "in order to find [Prioleau] guilty of murder, [the jury] first had to find that he had intended to cause the death of the victim," it would be unreasonable to believe that the jury could have understood the trial court's instructions as not requiring the state to prove beyond a reasonable doubt that the defendant intended to kill the victim. Id., 322.

We also faced a similar factual situation in *State* v. *Austin*, supra, 244 Conn. 232–37, in which the defendant, Richard Austin, who was charged with murder, among other crimes, also claimed that the court improperly had charged the jury by including the entire statutory definition of intent. Id., 232. Upon review of the entire jury charge, we concluded in *Austin*, as we do in the present case, that the risk of juror confusion as a result of the improper instruction "was eliminated by the trial court's numerous proper instructions on the elements of murder." Id., 236.

In the present case, the trial court stated on at least six separate occasions, both in its initial charge and its supplemental charge, that, for the jury to find the defendant guilty of murder, the state must prove beyond a reasonable doubt that the defendant specifically intended to cause the victim's death.[7] This repeated

---

[7] The trial court's instructions to the jury included the following: "The first count of [the] information is murder. [The] [d]efendant is charged with the crime of murder in violation of . . . [§] 53a-54a (a), which, insofar as it applies to this case, provides as follows: A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person.

"For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt: That the defendant intended to cause the death of another person; and that, in accordance with that intent, the defendant caused the death of that person and death resulted by the actions of another.

instruction eliminated any possibility of juror confusion with respect to the element of intent. Moreover, as in *Austin*, "the factual issues of th[e] [present] case mitigate against the possibility of jur[or] confusion. A court's charge is not to be examined in a vacuum. Rather, it is to be viewed in the context of the factual issues raised at the trial." (Internal quotation marks omitted.) Id., 237. The defendant admitted to police and at trial that he had pointed his gun in the direction of the victim and had pulled the trigger, thereby discharging a bullet toward the victim. Thus, the only disputed issue for the jury to resolve was the defendant's mental state in connection with the shooting. Accordingly, "[i]t strains reason to believe that the jury could have [understood] the challenged instruction as not requiring that the state prove beyond a reasonable doubt that the defendant intended to kill [the victim]." (Internal quota-

* * *

"The state must prove beyond a reasonable doubt that the defendant caused the death of the victim with intent to cause that death. Now I'll explain these elements to you. The first element is that the defendant . . . had the intent to cause the death of another person, to wit, [the victim].

"Intent relates to the condition of mind of the person who commits the act; his purpose in doing it. As designed by our statute and law, a person acts intentionally with respect to a result or to conduct when his conscious objective is to cause such result or to engage in such conduct.

* * *

"Now the state must prove beyond a reasonable doubt that the defendant . . . in causing the death of the victim, did so with the specific intent to cause the death. . . .

"The type and number of wounds inflicted, as well as the instrument used, may be considered as evidence of the perpetrator's intent, and from such evidence, an inference may be drawn in some cases that there was an intent to cause the death.

* * *

"The next element of murder. Acting with the intent to cause the death of another person, the defendant caused the death of that person. . . .

"If you find that the state has proven beyond a reasonable doubt each element of the crime of murder, the defendant had the intent to cause the death of [the victim], and acting with the intent, he caused the death of [the victim], then you shall find the defendant guilty."

tion marks omitted.) Id., quoting *State* v. *Prioleau*, supra, 235 Conn. 322.

## II

The defendant next claims that the trial court's instructions on self-defense were improper. We decline to review this claim because it was inadequately briefed.

The defendant asserts, in one short paragraph of his brief, that his testimony "that he believed that [Alers] fired the five shots within a second or two after [the defendant] fired the warning shot as a reaction to [the victim's attempt] to draw a gun was sufficient to provide a justifiable reason for [Alers'] actions other than the existence of a conspiracy." The defendant's brief contains no legal analysis or authority to support his conclusory claim that the trial court improperly instructed the jury on self-defense.[8] We therefore decline to review

[8] The inadequacy of the defendant's brief with respect to the claimed impropriety in the trial court's instructions on self-defense is exacerbated by the myriad of positions that defense counsel has taken on this issue throughout the course of the proceedings. At trial, defense counsel requested, without further explanation, that the trial court charge the jury that self-defense is a defense to the crime of conspiracy to commit murder. In doing so, defense counsel failed to provide the trial court with any proposed jury instructions, any explanation as to the legal theory behind the request and any legal authority to support such a request. Furthermore, defense counsel made no suggestion to the trial court that his requested charge involved Alers, rather than the defendant, acting in self-defense. In the brief submitted to this court on behalf of the defendant, however, defense counsel proposed that Alers had shot the victim in self-defense and claimed that, as a result, a self-defense instruction with respect to the defendant's conspiracy to commit murder count was warranted. At oral argument in this court, defense counsel modified his claim again, arguing this time that he was not claiming that self-defense was a defense to conspiracy to commit murder but, rather, an alternative explanation for the shooting. In the ensuing argument, however, defense counsel suggested that self-defense does apply to the mens rea element of the offense of conspiracy to commit murder. In any event, we are unaware of any authority that supports the defendant's request at trial for an instruction on self-defense as to the charge of conspiracy to commit murder, and the defendant has provided no legal analysis or legal authority to suggest otherwise.

his claim. See, e.g., *State* v. *Prioleau*, supra, 235 Conn. 294–95.

## III

The defendant next claims that the trial court improperly instructed the jury on the defendant's duty to retreat. Essentially, the defendant takes issue with the fact that the trial court did not tailor the jury charge to include a specific instruction that the defendant's ability to retreat should only be measured at the moment in time that the defendant fired his gun. We conclude, however, that the trial court's instructions properly informed the jury about the defendant's duty to retreat.

The standard of review governing the defendant's claim that the trial court improperly instructed the jury on his defense of self-defense "is whether it is reasonably possible that the jury was misled." (Internal quotation marks omitted.) *State* v. *Ash*, 231 Conn. 484, 493, 651 A.2d 247 (1994). General Statutes § 53a-19 establishes the defense of self-defense and sets forth the circumstances justifying the use of physical force. Pursuant to General Statutes § 53a-19 (a), a person is justified in using deadly force only if another person is "(1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm." General Statutes § 53a-19 (b), which specifies the circumstances under which a person has a duty to retreat, provides in relevant part: "[A] person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating . . . ."

Following its instructions on self-defense, the trial court instructed the jury on the duty to retreat in accor-

dance with § 53a-19 (b).[9] Although the court's instructions conveyed the requirements of § 53a-19, the defendant maintains that an instruction tailored to the facts of the case was essential to convey to the jury that the defendant's ability to retreat should be measured at the exact point in time that he fired his gun.

As we previously stated, we follow the well settled rule that the charge to the jury must be considered in its entirety. E.g., *State* v. *Denby*, supra, 235 Conn. 484–85. Consequently, we look to the trial court's instructions on self-defense to discern whether it is possible that the trial court's instruction on the duty to retreat misled the jury. During its charge on self-defense, the trial court instructed the jury that "[d]eadly physical force may not be used unless the actor, meaning the defendant, reasonably believes that such other person, meaning the deceased victim in this case, is using or about to use deadly physical force or inflicting or about to inflict great bodily harm on him."[10]

---

[9] The trial court instructed the jury in relevant part: "A person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety—by retreating. [General Statutes § 53a-19 (b)] requires . . . both that retreat was completely safe and available and that the defendant knew of it. Complete safety means without any injury whatsoever to him.

"The self-defense statute focuses on the person claiming self-defense. It focuses on what he reasonably believes under the circumstances and presents a question of fact as to whether a safe retreat was available and whether the defendant subjectively knew of it. Retreat is only required where the defendant himself knows that he can avoid the necessity of using the physical force with complete safety.

"If you find proven beyond a reasonable doubt that a safe retreat was available and the defendant knew of it, you should reject the self-defense claim. The law stresses that self-defense cannot be retaliatory and must be defensive and not punitive. You must ask yourself, did the defendant know he could avoid the use of deadly physical force by retreating safely? If so, and yet he chose to pursue the use of deadly physical force, you should reject the self-defense claim."

[10] The trial court instructed the jury in relevant part: "On the issue of self-defense, there is a Connecticut law [entitled] 'Use of physical force in the defense of person.' A person is justified in using reasonable physical force upon another person to defend himself or [a] third person from what he

Thus, the trial court instructed the jury that the determination of whether the defendant acted in self-defense is limited to consideration of whether the defendant reasonably believed that the victim was using or about to use deadly physical force or was inflicting or about to inflict great bodily harm upon the defendant at the moment that the defendant had used deadly force. The duty to retreat, therefore, also was limited to the specific point in time that the defendant used deadly force upon the victim. Consequently, the defendant's concern that the trial court, in charging the jury on self-defense, failed to instruct the jury to measure the defendant's ability to retreat at the point in time that he fired his gun is unfounded. Upon review of the trial court's entire instructions on self-defense, we conclude that it was not reasonably possible that the jury was misled as to the defendant's duty to retreat.

## IV

The defendant's fourth claim of error is that the trial court deprived him of his constitutional right to testify[11] by refusing to allow him to testify as to: (1) a prior

reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose, except that deadly physical force may not be used unless the actor reasonably believes that such other person is using or about to use deadly physical force, or inflicting or about to inflict great bodily harm.

"In this case we [are] talking about the use of deadly physical force by the defendant. It is therefore the last portion of that [statute] which I read to you that is indicated in this case. I'm going to read it to you again. Deadly physical force may not be used unless the actor, meaning the defendant, reasonably believes that such other person, meaning the deceased victim in this case, is using or about to use deadly physical force or inflicting or about to inflict great bodily harm on him. Deadly physical force means physical force that can reasonably be expected to cause death or serious physical injury."

[11] Although the defendant alleges a violation of his federal and state constitutional rights, he has presented no independent state constitutional analysis and, therefore, we limit our review to the defendant's federal constitutional claim. See, e.g., *State* v. *Eady*, 249 Conn. 431, 435 n.6, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999).

altercation between one of the defendant's associates and one of the victim's associates; and (2) subsequent death threats by another one of the victim's associates against the defendant and some of his associates. We find no error.

At the outset, we note that, although the defendant asserts a violation of his right to testify, claims of this nature are more properly framed as claims regarding the right to present a defense under the sixth amendment to the United States constitution. See, e.g., *State* v. *Cavell*, 235 Conn. 711, 720, 670 A.2d 261 (1996); *State* v. *Smith*, 222 Conn. 1, 15, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992). The constitutional right to present a defense does not compel the admission of any and all evidence offered in support thereof. *State* v. *Shabazz*, 246 Conn. 746, 758 n.7, 719 A.2d 440 (1998), cert. denied, 525 U.S. 1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999); *State* v. *Bova*, 240 Conn. 210, 236, 690 A.2d 1370 (1997). "The trial court retains the discretion to rule on the admissibility, under the traditional rules of evidence, regarding the defense offered." *State* v. *Shabazz*, supra, 758 n.7.

"Upon review of a trial court's decision, we will set aside an evidentiary ruling only when there has been a clear abuse of discretion. . . . The trial court has wide discretion in determining the relevancy of evidence . . . and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Rolon*, 257 Conn. 156, 173, 777 A.2d 604 (2001).

"It is well settled . . . that an accused may introduce evidence of the violent, dangerous or turbulent character of the victim to show that the accused had reason to fear serious harm, after laying a proper foundation

by adducing evidence that he acted in self-defense and that he was aware of the victim's violent character." *State* v. *Miranda*, 176 Conn. 107, 109, 405 A.2d 622 (1978). We also have "allow[ed] the accused to introduce evidence of the victim's violent character to prove that the victim was the aggressor, regardless of whether such character evidence had been communicated to the accused prior to the homicide." *State* v. *Smith*, supra, 222 Conn. 17; see *State* v. *Miranda*, supra, 109–11. This court has refused, however, to extend this rule further in holding that specific acts of violence not resulting in a criminal conviction are inadmissible to prove the victim's violent character. *State* v. *Smith*, supra, 18. We reasoned that the admission of such evidence potentially could unfairly surprise the opposing party, arouse undue prejudice, inject collateral issues into the trial and confuse the jury. Id.; see also *State* v. *Miranda*, supra, 112. Although *Smith* involved an offer of evidence of specific acts of violence to establish that the victim was the aggressor as opposed to an offer to establish the reasonableness of the defendant's fear of the victim; *State* v. *Smith*, supra, 17; some of the concerns expressed therein, namely, the dangers of injecting collateral issues into the trial and confusing the jury, are equally applicable in the present case.

The defendant argues that the evidence regarding a prior fight between parties other than himself and the victim as well as subsequent threats by a party other than the victim should have been admitted. The defendant argues that such evidence would allow the jury to "gauge [properly] the reasonableness of the defendant's belief that he was in great danger of great bodily harm."

The defendant was allowed to introduce substantial evidence of both the ongoing violent feuds between

his associates and the victim's associates[12] and specific death threats that the victim himself had directed at the defendant.[13] The trial court properly exercised its

[12] On direct examination, the defendant testified concerning the victim's threats against Mongkosilapa:

"Q. And where was it that you first met the deceased, [the victim]?

"A. The first time I met [the victim] . . . he drove by Grove Street threatening [Mongkosilapa].

* * *

"Q. In relationship to the date of July 28, [1996], when was it that you first met—saw [the victim] drive by and threaten [Mongkosilapa]?

"A. I don't remember the specific day, but he did come through driving by Grove Street, and he got out of the car, and he was asking for him, and that day, [Mongkosilapa] ran away. That's when people around me told me that that was [the victim] and [that he] and [Mongkosilapa] had problems going on.

* * *

"Q. And what did [the victim] do that you saw?

"A. He came out . . . looking for [Mongkosilapa], telling us—addressing it to us actually that he wanted to beat him, jump him, basically just hit him, stuff like that.

* * *

"Q. The first time you saw [the victim] threaten [Mongkosilapa, he] ran away, is that correct?

"A. Yes."

Furthermore, Lieutenant Neil O'Leary and Sergeant James Nardozzi, both of the Waterbury police department, and Rodriguez, all testified about the feud between Mongkosilapa and the victim.

[13] The defendant testified on direct examination as follows:

"Q. [D]irecting your attention to the time period starting at a few days after your birthday of July 9, 1996, in that period of time or a few days after your birthday until the date of this incident, the early morning hours of July 28, [1996] did you have any encounters with [the victim]?

"A. Yes, I did.

"Q. And how often [during] that period of time would you have an encounter—the period of time we were talking of—with a—was a few days after your birthday from July [28], 1996, did you have any encounters with [the victim]?

"A. He was always driving by. He [would] always state, as he was driving by, you're dead. Or he would, with his hands, go like this.

"Q. Put his hand to his throat with a motion like cut your throat?

"A. Yes, yes.

"Q. And how often would this be as far as between the days on a daily basis? What basis?

"A. Basically almost every day."

discretion in excluding additional evidence regarding a specific altercation between two other parties and a series of subsequent threats by a third party that allegedly resulted therefrom. Such evidence was collateral and likely would have confused the jury. Cf. id., 18. Consequently, the trial court's exclusion of the foregoing evidence did not deprive the defendant of his sixth amendment right to present a defense.

## V

Lastly, the defendant claims that the trial court abused its discretion in excluding expert testimony concerning gangs. On appeal, the defendant maintains that such testimony was essential to his claim of self-defense.[14] The state argues, inter alia, that any error in the trial court's evidentiary ruling was harmless because the proffered evidence would have been cumulative. Inasmuch as we agree with the state that the excluded testimony would have been merely cumulative, we need not address whether the trial court abused its discretion.[15]

---

[14] Defense counsel attempted to argue that the testimony of Lieutenant Neil O'Leary of the Waterbury police department also was relevant to a claim that the defendant acted under duress. The defendant did not pursue his claim of duress on appeal.

[15] We note, however, that, in a factually similar case; State v. Matos, 240 Conn. 743, 765, 694 A.2d 775 (1997); we concluded that no abuse of discretion had occurred. In Matos, the "defendant [Jaime Matos] challenge[d] the trial court's rulings that excluded evidence concerning the victim's affiliation with a gang, i.e., testimony that the victim was a gang member and that the gang was violent and had access to guns. [Matos] argue[d] that this evidence was relevant to his belief that the victim had deadly force at his command, although the victim himself was not using deadly force, and that this belief [went] to his self-defense claim. The trial court ruled that because [Matos] had testified that it was the victim whom he feared and that the victim was the person he shot, evidence concerning the other gang members' tendencies for violence was not relevant to [Matos'] claim. After a thorough review of the record, we [concluded] that the trial court [did not abuse] its discretion in excluding [Matos'] proffered evidence on the basis of its irrelevance to [Matos'] self-defense claim." Id., 764–65.

The following additional facts are necessary to our resolution of the defendant's claim. Outside the presence of the jury, defense counsel attempted to qualify Lieutenant Neil O'Leary of the Waterbury police department as an expert witness on gangs generally and, more specifically, Latin Kings gang members' propensity for violence.[16] The state objected, and the trial court sustained the objection, ruling that the testimony was irrelevant.

"Under the current and long-standing state of the law in Connecticut, the burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant. The defendant must show that it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 638, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000); see *State* v. *Brown*, 199 Conn. 14, 25, 505 A.2d 690 (1986).

In the present case, testimony concerning "green lights," the Latin Kings and their propensity for violence was introduced into evidence on several occasions. For instance, during direct examination, the defendant testified to an incident during which Alers was "beaten up" by certain members of the Latin Kings. The defendant also testified that a "green light" meant that the Latin Kings wanted to kill a person and that he had information that the Latin Kings had a "green light" to kill him. Furthermore, Sergeant James Nardozzi of the Waterbury police department testified that he previously had received numerous complaints concerning members of the Latin Kings threatening to kill members of another gang and members of the other gang threatening to kill

---

[16] Defense counsel represented to the trial court that O'Leary was "qualified to testify as to how the Latin Kings work, how green lights go down, how people are terminated and how dangerous they are involving their propensity for becoming involved in street violence and drive-by shootings."

members of the Latin Kings. Nardozzi also testified that a "green light" is "[t]he go ahead to kill someone" and that he previously had received complaints concerning "green lights." In short, the jury was well apprised of the fact that Latin Kings are a violent group. We therefore conclude that any additional testimony concerning the Latin Kings would have been merely cumulative, and any impropriety in disallowing the testimony was harmless.

The judgment is affirmed.

In this opinion the other justices concurred.