******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOHN
JOSEPH LEPESKA
(AC 37637)

Lavine, Alvord and Bear, Js.

*Argued September 21—officially released October 25, 2016*

(Appeal from Superior Court, judicial district of
Waterbury, geographical area number four, Crawford,
J.)

*Peter G. Billings*, with whom, on the brief, was *Sean
P. Barrett*, for the appellant (defendant).

*Jennifer F. Miller*, deputy assistant state's attorney,
with whom, on the brief, were *Maureen Platt*, state's
attorney, and *Marc G. Ramia*, senior assistant state's
attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant argues, "[a]ll of the conduct set forth by the state amounts to an attempt to reconcile by a man who did not know that his relationship was over." We disagree.

The defendant, John Joseph Lepeska, appeals from the judgment of conviction, rendered after a jury trial, of stalking in the second degree in violation of General Statutes § 53a-181d (b) (1).[1] On appeal, the defendant claims that (1) there was insufficient evidence to prove that the victim's[2] fear for her physical safety was objectively reasonable and (2) the trial court improperly excluded the testimony of two defense witnesses. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. The defendant and the victim met in 1978. In December, 2011, they reconnected and began dating. Shortly thereafter, in February, 2012, they began living together at the victim's residence. During their relationship, there were incidents of domestic violence.[3]

On August 3, 2013, at approximately 3:30 a.m., the victim was arrested after a domestic violence incident between her and the defendant.[4] The victim was released later that day at approximately 7 a.m.; a condition of her release was that she could not have contact with the defendant.[5] An officer drove the victim from the police station to her house so that she could pick up her vehicle. The victim proceeded to the residence of her friend, Joseph Gorman, because she had a mobile home parked on his property.

While driving to Gorman's house, the victim noticed the defendant driving up behind her in his van at a high rate of speed. As a result, she "froze" and stopped her vehicle. The defendant, who appeared very agitated, jumped out of his van, started shaking his fist, and screamed that the victim "better not be going to Joey's house because if [she] was . . . he was going to do something . . . ." As the defendant began to walk toward her, the victim realized that she should not have stopped her vehicle, and she drove away from the defendant and called 911. The defendant did not follow her. The victim met with state police troopers alongside the road to report the incident, and then she proceeded to Gorman's house.

That same day, at approximately 1 p.m., the victim, her daughter, and another friend went to a Verizon store. While at the Verizon store, the victim noticed the defendant driving back and forth, sounding his horn, and waving at her.[6] The victim estimated that he drove back and forth approximately four or five times, sounding the horn and waving at her each time. The victim did not report this incident to the police at that time.

That evening, the victim returned to her mobile home on Gorman's property. While the victim and Gorman were sitting in his garage, the defendant drove up in his van. When the victim heard a vehicle approaching, she asked Gorman to see if it was the defendant. When she saw the defendant approaching her, she ran back into her mobile home, locked the doors, and called 911 because she was "petrified," "terrified that [the defendant] would harm [her]." The victim did not speak with the defendant that evening. Instead, Gorman approached the defendant and told him that he was not welcome on the property and needed to leave. The defendant then left Gorman's property. When the officers arrived, the victim provided them with an account of the incident.

On August 5, 2013, the victim went to the courthouse with her daughter for a court hearing relating to her August 3 arrest. Upon arrival, they went to speak with a family services officer. While they were waiting, the defendant repeatedly called the cell phone of the victim's daughter, insisting that she relay messages to the victim or put the victim on the phone. The victim refused to speak with the defendant. Shortly thereafter, the defendant arrived at the courthouse, sat down in a chair across from the victim, and began motioning for the victim to go down the hallway with him. When the victim refused to go with him, the defendant moved next to her and began to talk to her about reconciling. When the family services officer came out into the hallway, she reminded them that they were not permitted to interact with each other as a condition of the victim's release. The victim then waited for her court appearance down the hall with her daughter. The defendant remained at the courthouse as well. When court resumed, the defendant sat across the courtroom from the victim.

During the luncheon recess, the victim and her daughter went to put more money in their parking meter after the defendant called the victim's daughter to tell her that the meter was running out. The defendant again called the victim's daughter to ask her and the victim to drive to a gas station down the street so that they could talk. Shortly thereafter, the defendant approached them at the vehicle while they were sitting inside of it. He began yelling through the passenger's side window, where the victim's daughter was sitting. The defendant wanted the victim to go to the gas station with him so that they could reconcile, and he told her that if they did reconcile, he would tell the judge that he did not want the no contact order in place anymore. The victim refused to go with the defendant, and, instead, she and her daughter got out of her vehicle and proceeded down the street, away from the defendant. The defendant chased the victim, yelling at her in an attempt to get her to talk to him and reconcile.

The victim and her daughter attempted to get away from the defendant by crossing several streets and going into a café for lunch.

The victim and her daughter eventually returned to the courthouse. While there, the victim's daughter called her father, the victim's former husband, to pick her up from the courthouse because it was getting to be late in the afternoon. While the victim's daughter met with the victim's former husband outside the courthouse, the victim initially stayed inside the courthouse. When the victim exited the courthouse, the defendant again tried to confront her, and she attempted to evade him by going to different locations around the courthouse. When the defendant continued to run after her, the victim went to her former husband's vehicle.

At that point, the victim's former husband told their daughter to call 911 because the defendant's behavior was "ridiculous, there's a protective [condition] in place, [and] he shouldn't be trying to go after her."[7] The victim's former husband advised the victim to go back inside the courthouse because it would be safe for her in there. The victim then ran back into the courthouse, and the defendant followed her up to the courthouse doors. Once inside the building, the victim told the marshals what had happened, and they told her to speak with a family services counselor. Unable to meet with a family services counselor before court resumed, the victim returned to the courtroom and reported the defendant's conduct to the court when her case was called.

After her appearance in court, the victim left the courthouse. Later that day, the victim began receiving phone calls from a blocked phone number. Initially, the victim answered the phone, but when she recognized the defendant's voice, she stopped answering the calls. The defendant's persistent calls continued throughout the night.

The next morning, on August 6, 2013, the victim discovered that she had voice mails from the defendant, who was, again, begging her to reconcile. The victim called the police department to report the calls, and she was instructed to go to the nearest police station to fill out a report of the incident, which she did. After making the report, the victim went to work. When she arrived at work, the victim's supervisor informed the victim that she had received a voice mail from the defendant stating that the victim would not be at work that day because she had been arrested and was in court. The defendant further stated in the voice mail that "he personally had witnessed [the victim] taking a cash bribe of at least two thousand dollars from a supplier. That [the victim] had done so in exchange for [her] having been awarded some work to that supplier. He also stated that [she] had shared company secrets with him. And that if [her] boss did not tell [the victim]

to call him and reconcile with him and turn his . . . fuckin' phone back on,[8] that he was going to call Sikorsky Corporate United Technologies and report the same." (Footnote added.) The victim called the police department to report the incident, but the defendant was not arrested because of that report.

The next day, August 7, 2013, the victim was scheduled to play pool at a local pool club as a member of her weekly pool league. The defendant was also a member of the pool league. Prior to the victim's arrival, the defendant approached one of the victim's teammates, Jan King, and asked her to call the victim. The defendant, who appeared "frustrated," told King to tell the victim to call him or else "he was going to make [her] life so miserable that [she] would have no choice but to call him." King then called the victim to tell her what had happened, but King emphasized that the victim should not contact the defendant and that she should continue to keep her distance from him because of the no contact order.

From August 8, 2013 until the defendant's arrest in October 9, 2013, the victim continued to receive blocked calls on her cell phone.[9] Sometimes she would receive dozens of calls from the defendant within a short period of time.[10] On August 9, 2013, in addition to receiving phone calls from a blocked number, the victim found flowers on her vehicle in the morning.

A few days later, on the victim's birthday, she did not awake to find any missed phone calls. She believed that she was finally getting a "reprieve" from the defendant, but later she saw that someone had painted "happy birthday XO" in bright white paint across the street outside of the property where she was now staying with her father. At approximately 7 a.m., she began receiving more phone calls from a blocked number. She received approximately forty-three calls that day. The victim notified the police about what happened that day, and the police contacted the defendant, but did not arrest him. Because of the defendant's conduct on her birthday, the victim decided to leave the spotlights on at night, and her father began leaving his gun safe unlocked.

On August 15, 2013, the defendant continued to attempt to contact the victim, now through Facebook's message system. The victim received numerous Facebook messages from the defendant.

On August 28, 2013, the victim applied for a protective order against the defendant. That same day, she was scheduled to play in her weekly pool league. Prior to the match, the victim's pool team decided to change the location of the match with the hope that the defendant would not show up and the victim would be able to play. Nevertheless, the defendant showed up at the new location. Upon arriving at the pool hall, the defendant

approached one of the victim's teammates, James Bradley, and told him to call the victim and tell her that she could not play because of the no contact order. When Bradley stepped outside to call her, the "irate" defendant came "storming out of the bar, screaming and yelling obscenities and everything." The victim recalled hearing through the phone the defendant screaming something to the effect of "tell her I'll fucking kill her, how dare she serve a restraining order paperwork on me . . . ." Bradley told the defendant to back off, hung up the phone, and went back inside the bar. Ultimately, the pool team elected to forfeit the last two games of the night so that they would not have to continue to play pool with the defendant, which rendered them ineligible for the regional tournament in Las Vegas, Nevada.

On September 6, 2013, the victim's daughter made a comment on Facebook that she and her mother were planning to go to a local festival the following day. That night, the victim's daughter received a phone call from the defendant, who told her, "I'm coming there after your mother, I'm going to fuck her up."[11] Because the victim and her daughter were not at the festival that day, they were not worried about running into the defendant and hoped that he would continue to think that the victim was at the festival.

On September 16, 2013, the victim approached the Office of the State's Attorney about the defendant's conduct, and she met with four officers to provide a statement about the defendant's conduct. The detectives assigned to investigate the case subsequently contacted the defendant about the victim's allegations. When one of the detectives met with the defendant, the defendant informed him "that this is a free country and that he didn't feel that a judge could issue a protective order to stop him from seeing the person that he loved. That there was recently a restraining order placed that he was having a hard time not violating."

On September 2, 2014, a jury trial commenced on a one count long form information charging the defendant with stalking in the second degree, in violation of § 53a-181d (b) (1), for his conduct between August 3, 2013 and September 8, 2013. On September 5, 2014, the jury found the defendant guilty of the charged crime. That same day, the defendant pleaded nolo contendere to a part B information charging him with being a persistent offender pursuant to General Statutes § 53a-40d. This appeal followed.

I

The defendant's first claim on appeal is that there was insufficient evidence for the jury to find him guilty of stalking in the second degree. In his view, "[a]ll of the conduct set forth by the state amounts to an attempt to reconcile by a man who did not know that his rela-

tionship was over"; therefore, no reasonable jury could have concluded that the victim's fear of the defendant during the time in question was objectively reasonable. We disagree.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt . . . . [A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Crespo*, 317 Conn. 1, 16–17, 115 A.3d 447 (2015).

To obtain a conviction under § 53a-181d (b) (1), the state must prove beyond a reasonable doubt that the defendant "knowingly engage[d] in a course of conduct directed at a specific person that would cause a reasonable person to fear for such person's physical safety or the physical safety of a third person . . . ." "The standard to be applied in determining the reasonableness of the victim's fear in the context of the crime of stalking is a subjective-objective one . . . . As to the subjective test, the situation and the facts must be evaluated from the perspective of the victim, i.e., did she in fact fear for her physical safety? . . . If so, that fear must be objectively reasonable, i.e., a reasonable person under the existing circumstances would fear for his or her physical safety." (Internal quotation marks omitted.) *State* v. *Arthurs*, 121 Conn. App. 520, 526–27, 997 A.2d

568, cert. denied, 310 Conn. 957, 82 A.3d 626 (2013).

The defendant challenges only the objective reasonableness of the victim's fear. In this case, the recited testimony clearly provided an adequate basis for the jury to find that the victim's fear was objectively reasonable. Between August 3, 2013 and September 8, 2013, the defendant engaged in obsessive behaviors, such as calling the victim dozens of times a day, including during the night, and sending her numerous Facebook messages. He engaged in this conduct even though he knew that a no contact order was in place, even though the victim told him that she did not wish to speak with him, and even though he knew that the victim had ignored his prior attempts to contact her. On three occasions, he attempted to approach the victim in person to discuss their relationship, and the victim testified that each time, she promptly made an effort to get away from the defendant. The victim further testified that during those incidents in which the defendant was physically present, she felt "terrified for [her] life."

The defendant's obsessive, stalking conduct infiltrated the victim's personal and professional life as well. The defendant repeatedly called the victim's friends and family in an attempt to talk to her. On August 6, 2013, the victim's supervisor received a voice mail in which the defendant accused the victim of taking bribes and sharing company secrets and threatened to report this conduct to the corporate office if the victim did not call him and reconcile with him. The following day, the defendant told King that "he was going to make [the victim's] life so miserable that [she] would have no choice but to call him." On August 28, 2013, the defendant screamed that he was going to kill the victim for seeking a protective order. Finally, on September 6, 2013, the defendant told the victim's daughter that "I'm coming there [to the festival] after your mother, I'm going to fuck her up."

When other individuals observed the defendant's conduct, they did not merely shrug off the behavior as that of a man attempting to patch things up with his girlfriend. On August 3, 2013, when the defendant attempted to talk to the victim at Gorman's house, Gorman told the defendant he was not welcome on the property and had to leave. When the defendant continued to stalk the victim at the courthouse on August 5, 2013, the victim's former husband and daughter called 911 to report the defendant's behavior and waited approximately one hour for an officer to respond so that they could file a complaint. The following week, the defendant's conduct on the victim's birthday caused the victim's father, with whom she was staying, to leave his gun safe unlocked.

"The stalking statute was enacted to address the situation where the criminal does not physically take an act against the person or does not verbally make a

direct an[d] immediate threat of harm, but merely stalks the victim. . . . The statute can be violated without a defendant's uttering a syllable, writing a word, or making a gesture. . . . [D]efendants' obsessive behaviors, even in the absence of threats of physical violence, [can] reasonably [cause] their victims to fear for their physical safety." (Citation omitted; internal quotation marks omitted.) *State* v. *Russell*, 101 Conn. App. 298, 320–21, 922 A.2d 191, cert. denied, 284 Conn. 910, 931 A.2d 934 (2007).

In sum, the evidence presented at trial, viewed in the light most favorable to sustaining the jury's verdict, was sufficient to establish beyond a reasonable doubt that the defendant's entire course of conduct caused the victim to reasonably fear for her physical safety. Accordingly, the defendant's first claim fails.

II

The defendant next claims that (1) the trial court abused its discretion by excluding the testimony of two defense witnesses and that (2) the exclusion of this testimony violated his right to present a defense as guaranteed by the sixth amendment to the United States constitution. We disagree.

The sixth amendment to the United States constitution guarantees "the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies." (Internal quotation marks omitted.) *State* v. *Cerreta*, 260 Conn. 251, 260–61, 796 A.2d 1176 (2002). The defendant's right to present a defense, however, "does not compel the admission of any and all evidence offered in support thereof. . . . The trial court retains the discretion to rule on the admissibility, under the traditional rules of evidence, regarding the defense offered." (Citations omitted; internal quotation marks omitted.) *State* v. *DeJesus*, 260 Conn. 466, 481, 797 A.2d 1101 (2002).

"[W]e will set aside an evidentiary ruling only when there has been a clear abuse of discretion. . . . The trial court has wide discretion in determining the relevancy of evidence . . . and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) Id. "If, after reviewing the trial court's evidentiary rulings, we conclude that the trial court properly excluded the proffered evidence, then the defendant's constitutional claims necessarily fail." *State* v. *Davis*, 298 Conn. 1, 11, 1 A.3d 76 (2010).

After the state rested its case-in-chief, the defendant indicated that he wished to call two officers to testify about prior domestic incidents involving the defendant

and the victim. The state objected on the grounds that the testimony was irrelevant and related to collateral matters. The court, after offers of proof, sustained the state's objections. We will address the testimony of each officer in turn.

A

The defendant first sought to present evidence about a domestic incident that occurred on August 2, 2013, the day before the defendant's stalking commenced. Following a disagreement that occurred over lunch, the defendant drove away with the victim's purse, and the victim and the defendant exchanged text messages about how he should return her purse. The victim subsequently went to the police station claiming that the defendant was sending her threatening text messages. Officer Alexia Castro reviewed the text messages sent by the defendant and determined that they were not threatening in nature.

At trial, the defendant cross-examined the victim concerning this incident and the fact that the defendant was not arrested because of her allegation.[12] During cross-examination, the victim disagreed with defense counsel that the basis for her complaint was text messages rather than threatening phone calls. After the state rested its case-in-chief, the defendant indicated that he wished to call Castro to testify further about this incident. The court permitted the defendant to present Castro's testimony outside the presence of the jury. Castro testified that she recalled the victim coming into the police station to make a complaint about threatening text messages, that she reviewed the text messages and determined that they were nonthreatening, and that she called the defendant to get his version of events. The court sustained the state's objection, holding that the proffered testimony was irrelevant, related to a collateral matter, and was insufficient to establish bias, prejudice, or interest on the part of the victim to testify falsely.

On appeal, the defendant argues, as he did before the trial court, that Castro's testimony was admissible to show the victim's bias and motive as well as to show that the victim's fear of the defendant was not objectively reasonable. The state responds that Castro's testimony was irrelevant and related to a collateral matter. We agree with the state.

"[I]t has long been the rule in Connecticut that extrinsic evidence may not be used to contradict the testimony of a witness with regard to a particular act of misconduct. . . . [I]f the witness stands his ground and denies the alleged misconduct, the examiner must take his answer not that he may not further cross-examine to extract an admission, but in the sense that he may not call other witnesses to provide the discrediting acts." (Internal quotation marks omitted.) *State* v. *Jose G.*,

290 Conn. 331, 345, 963 A.2d 42 (2009). "Extrinsic evidence may be admitted, however, if the subject matter of the testimony is not collateral, that is, if it is relevant to a material issue in the case apart from its tendency to contradict the witness. . . . Evidence tending to show the motive, bias or interest of an important witness is never collateral or irrelevant. It may be . . . the very key to an intelligent appraisal of the testimony of the [witness]." (Internal quotation marks omitted.) Id., 345 n.11; see also Conn. Code Evid. § 6-5, commentary.

"The determination of whether a matter is relevant or collateral . . . generally rests within the sound discretion of the trial court." *State* v. *Colton*, 227 Conn. 231, 248, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996). "The [trial] court [is] in the best position to determine whether the proffered testimony pertained to a collateral matter or whether it was relevant. The [trial] court's evidentiary rulings are given great deference precisely because the [trial] court [is] in the best position to hear and to assess the witnesses' testimony in the context of the entire trial." *State* v. *Reyes*, 81 Conn. App. 612, 620, 841 A.2d 237 (2004).

One of the issues at trial was whether the defendant's conduct between August 3, 2013 and September 8, 2013 would cause a reasonable person to fear for her physical safety. The proffered testimony about an allegation made by the victim on August 2, 2013 had no bearing on that issue. The only potential value of Castro's testimony was its ability to contradict the victim's testimony that her complaint was based on the defendant's having made threatening phone calls rather than having sent threatening text messages. Thus, the evidence constituted improper impeachment through extrinsic evidence on a collateral matter. Moreover, the testimony was insufficient to show any bias, prejudice, or interest on the part of the victim that might cause her to testify falsely.

Consequently, we conclude that there was no abuse of discretion in the court's disallowing the testimony, and, therefore, the defendant's constitutional claim necessarily fails as well. See *State* v. *Davis*, supra, 298 Conn. 11.

B

The defendant also sought to present evidence of a second incident that occurred in February 2013 in which the victim and the defendant raised competing domestic violence claims against one another. The victim asserted that the defendant had thrown a work boot at her, which hit her hand, while the defendant asserted that the victim had thrown coffee at him. The investigating officer, Charles Schofield, decided to arrest the vic-

tim for disorderly conduct because there was physical evidence at the home of coffee being thrown, i.e., a coffee-soaked couch and T-shirt.

At trial, the defendant cross-examined the victim about the fact that she was arrested because of that incident.[13] The court permitted the defendant to summarize Detective Schofield's proposed testimony, outside the presence of the jury. In essence, the defendant offered that, if permitted to testify, Schofield would testify about his recollection of the coffee-throwing incident. His testimony would provide more detail about the incident, but not contradict the victim's testimony about it.

The defendant argued that Schofield's testimony demonstrated the victim's bias toward or motive against the defendant as well as her willingness "to make a report to the police that doesn't necessarily pan out." Upon inquiry from the court, however, the defendant acknowledged that the victim was questioned about the coffee-throwing incident during cross-examination and that the victim "admitted she was arrested as a consequence of that incident." The court specifically inquired as to whether any of the information that the defendant was seeking to elicit from Schofield was not already before the jury. The defendant responded that the specific allegation that the victim had thrown coffee at the defendant during the incident was not before the jury[14] as well as the fact that Schofield found evidence of coffee being thrown. When the state further argued that the evidence was irrelevant and addressed a collateral matter, the defendant responded that the specific details of the incident were relevant because they demonstrated "the nature of the relationship between [him and the victim]" and assisted the jury in evaluating whether the victim's fear was reasonable. The trial court ultimately sustained the state's objection, ruling that the evidence was irrelevant and collateral to the issues at trial.

On appeal, the defendant again argues that Schofield's testimony was admissible to show the victim's bias and motive and to show that the victim's fear of the defendant was not objectively reasonable. The state again responds that Schofield's testimony was irrelevant and related to a collateral matter. We agree with the state.

Schofield's proffered testimony about an incident that occurred in February 2013 had no bearing on the issue of whether the defendant's course of conduct between August 3, 2013 and September 8, 2013 caused the victim to have an objectively reasonable fear for her physical safety. The testimony was also insufficient to show any motive, bias, or interest on the part of the victim that might cause her to testify falsely. Consequently, we conclude that there was no abuse of discretion in the court's disallowing the testimony, and,

therefore, the defendant's constitutional claim necessarily fails as well. See *State* v. *Davis*, supra, 298 Conn. 11.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant was also charged by way of a part B information with being a persistent offender pursuant to General Statutes § 53a-40d. Following the jury's verdict of guilty of stalking in the second degree, the defendant was presented to the court on a plea of nolo contendere to the part B information.

[2] In accordance with our policy of protecting the privacy interest of the applicant for a protective order, we decline to identify the applicant or others through whom the applicant's identity may be ascertained.

[3] On one occasion, the defendant told the victim that "if [she] ever attempted to leave or if [she] . . . ever called the police on him that he'd kill [her]." The victim also testified that she considered applying for a protective order at that time, but someone recommended that she not do so because a protective order would not result in the defendant being removed from her house. The victim was also concerned about how the defendant might react to her serving him with a protective order.

[4] In October 2013, the charges against the victim were dismissed.

[5] Throughout the trial, witnesses incorrectly referred to the condition of release as a "protective order" or a "restraining order." For consistency and accuracy, we refer to this condition as a "no contact order."

[6] The victim had not had contact with the defendant since the incident alongside the road. She believed that the defendant might have learned where she was because the friend she was with tagged her in a Facebook post, which indicated their location at the Verizon store.

[7] The victim's daughter testified that at this point, although she did not feel personally threatened, "[she] felt more threatened for [her] mother . . . [she] felt bad for [her] mother that she had to go through this." The victim's daughter and former husband remained at the courthouse for approximately an additional thirty minutes to one hour so that they could talk to an officer in person, "to have something on record that we called and what the call was for." They called dispatch again while waiting to get an approximation of when an officer would arrive, but they were told it was an extremely busy day. Eventually an officer arrived at the courthouse to speak with them, but by that later time, they had already left.

[8] The victim testified that the defendant's cell phone was connected to her son's cell phone account and that her son had turned off service to the defendant's cell phone because of his recent conduct.

[9] The victim testified that her friends and family also received "harass[ing]" phone calls from the defendant.

[10] For example, on August 8, 2013, the victim recalled receiving two phone calls at lunch. On August 10, 2013, she woke to find dozens of missed calls made between 5:30 and 6:30 a.m. On August 11, 2013, she was awoken by approximately twenty to thirty calls between 5:30 a.m. and 6:30 a.m.

[11] The victim testified that she was with her daughter when she received this call and that because of the way her daughter was holding her cell phone she could overhear what the defendant was saying as well.

[12] The following colloquy occurred between defense counsel and the victim:

"[Defense Counsel]: Do you recall talking to Officer Castro on August 2nd?

"[The Victim]: I recall talking to an officer at the Naugatuck Police Department; I don't recall the name of the person.

"[Defense Counsel]: Was it a female officer?

"[The Victim]: I believe so.

"[Defense Counsel]: And your claim is that you didn't tell that officer that [the defendant] was sending you threatening messages?

"[The Victim]: [The defendant] made threatening phone calls—

"[Defense Counsel]: My question, ma'am, was whether or not you recall telling that officer that [the defendant] was sending you threatening messages following his departure from where you were having lunch on August 2, 2013?

"[The Victim]: Threatening messages? No.

"[Defense Counsel]: You didn't tell her that?

"[The Victim]: No.

"[Defense Counsel]: If I may approach the witness, Your Honor?

"[The Court]: You may. . . .

"[Defense Counsel]: Ma'am, that's Officer Castro's report of that incident. And about the third paragraph—is your testimony here that Officer Castro has incorrectly reported what you said to her?

"[The Victim]: I'm sorry, could you repeat that? . . .

"[Defense Counsel]: Did you have an opportunity to read that report?

"[The Victim]: I read part of it. . . . I don't see anything in here where it says that I told her that he was sending me threatening text messages. There's nothing that says that. It says I said he threatened me, which he did, but not in text messages. . . .

"[Defense Counsel]: And, ma'am, just so we're clear, do you have any trouble reading the English language?

"[The Victim]: No.

"[Defense Counsel]: Did you tell Officer Castro on that August 2nd date that you were in fear for your life?

"[The Victim]: I did.

"[Defense Counsel]: Why were you in fear for your life?

"[The Victim]: Because [the defendant] had told me in the past that if I ever attempted to leave or if I had ever called the police on him that he'd kill me.

"[Defense Counsel]: Was [the defendant] arrested as a result of that incident?

"[The Victim]: No."

[13] The following colloquy occurred between defense counsel and the victim:

"[Defense Counsel]: There was an incident from February of 2013, wasn't there?

"[The Victim]: Yes.

"[Defense Counsel]: And that incident you claimed that [the defendant] threw a boot at you, correct?

"[The Victim]: He did.

"[Defense Counsel]: The police were called, right?

"[The Victim]: Yup.

"[Defense Counsel]: And they confirmed that you, in fact, had thrown coffee at him; isn't that right?

"[The Victim]: No, sir.

"[Defense Counsel]: They didn't confirm that?

"[The Victim]: No, sir.

"[Defense Counsel]: You were arrested for that incident though, were you not?

"[The Victim]: For throwing coffee at him?

"[Defense Counsel]: Were you arrested for a domestic incident with [the defendant] in February of 2013?

"[The Victim]: Yes, sir."

[14] Defense counsel, however, was mistaken in his response to the court as he did question the victim about the fact that she was arrested for throwing coffee at the defendant in February 2013. See footnote 13 of this opinion.